EDERAL POWER COMMISSION *v.* PANHANDLE
EASTERN PIPE LINE CO. ET AL.

No. 558.   Argued April 22, 1949.—Decided June 20, 1949.

*Bradford Ross* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Philip Elman, Paul A. Sweeney, Melvin Richter, Morton Hollander, Bernard A. Foster, Jr.* and *Howell Purdue.*

*Robert P. Patterson* and *Jeff A. Robertson* argued the cause for respondents. With *Mr. Patterson* on the brief for the Panhandle Eastern Pipe Line Co. were *E. Ennalls Berl, John S. L. Yost* and *Francis J. Sypher.* With *Mr. Robertson* on the brief for the State Corporation Commission of Kansas were *Jay Kyle* and *Douglas Gleason.*

*Arthur G. Connolly, Kevin McInerney, Gerard C. Smith* and *Peter H. Kaminer* filed a brief for certain stockholders, respondents. *Charles S. Layton* was also of counsel.

MR. JUSTICE REED delivered the opinion of the Court.

Stated broadly this certiorari brings before us for review a problem involving the scope of the power over the gas reserves of a natural-gas company given to the Federal Power Commission by the Natural Gas Act. 52 Stat. 821, as amended, 56 Stat. 83. Specifically the question to be decided is whether a natural-gas company, subject to the Act, may sell the leases covering an estimated twelve per cent of its total gas reserves without the approval and contrary to an order of the Commission.

The issue is made very sharply because the District Court and the Court of Appeals have refused an injunction, sought by the Commission, to hold the consumma-

tion of the sale in abeyance until the Commission, through an admittedly permissible investigation, can determine whether the disposal of these reserves will impair the ability of Panhandle to supply its present and prospective customers in the area which it has undertaken to serve as a public utility. The Commission may find that public interest will best be served by requiring Panhandle to retain these reserves. The public interest has strong appeal to a court of equity for its remedies once a legal right is fairly in controversy.[1]

Respondent, Panhandle Eastern Pipe Line Company (herein called Panhandle), a Delaware corporation, transports and markets natural gas in interstate commerce by means of its pipe-line system which runs from Texas into Michigan. In addition it owns or controls gas-producing properties in Kansas, Oklahoma, and Texas.

In September, 1948, Panhandle organized Hugoton Production Company (hereinafter called Hugoton), also a Delaware corporation. On October 11, 1948, pursuant to a written agreement between the two companies, Panhandle transferred to Hugoton gas leases on approximately 97,000 acres of land in Kansas and $675,000 in cash. In return Panhandle received all the outstanding capital stock of Hugoton and the option to purchase on or after January 1, 1965, all or part of the gas produced from this land, which is at present undeveloped and not connected with any pipe-line system. The gas reserves under this acreage are estimated at approximately 700 billion cubic feet. Hugoton thereafter contracted to sell to the Kansas Power and Light Company for a period of fifteen years from November 1, 1949, to November 1, 1964, the gas produced from these leases, which, according

---

[1] *Porter* v. *Warner Co.*, 328 U. S. 395, 398; *Yakus* v. *United States*, 321 U. S. 414, 440; *Hecht Co.* v. *Bowles*, 321 U. S. 321, 331; *Virginian R. Co.* v. *System Federation*, 300 U. S. 515, 552; *Harrisonville* v. *Dickey Clay Co.*, 289 U. S. 334, 338.

to the contract, was to be consumed wholly within the State of Kansas.

On the same date as the transaction between Panhandle and Hugoton, Panhandle declared a dividend of the Hugoton stock to the holders of its common stock at the rate of one-half share of Hugoton stock for each share of common stock of Panhandle. The dividend was to be paid November 17, 1948, to Panhandle's stockholders of record on October 29, 1948. Nothing called to our attention indicates any control retained by Panhandle over the Hugoton stock.

On October 26, 1948, the Federal Power Commission (hereinafter called the Commission) ordered an investigation "pursuant to the provisions of Section 14 of the Natural Gas Act, of the facts and circumstances involved in the formation and proposed operation of the Hugoton Production Company and the transfer to said company by Panhandle Eastern of the natural-gas reserves . . . ." By a supplementary order of November 10, 1948, Hugoton was joined as a party, a date for a public hearing was fixed, and Hugoton and Panhandle ordered to show cause why they should not be directed to cancel the contract, and why Panhandle should not be prohibited from transferring the leases without the consent of the Commission and from distributing the Hugoton stock to its stockholders. Pending a final determination, the Commission ordered that the *status quo* be maintained by Panhandle and Hugoton.

Upon the apparent refusal of Panhandle to comply with this order, the Commission on November 13, 1948, instituted the instant suit in the United States District Court for the District of Delaware, seeking a preliminary injunction and a temporary restraining order to compel Panhandle to proceed no further with the stock distribution and to maintain the *status quo* pending the final determination of the questions for which the hearing

before the Commission had been set. The District Court issued the temporary restraining order which has been kept in effect by successive orders and which enjoined Panhandle from issuing to its stockholders the dividend of Hugoton stock. Panhandle was ordered to cause Hugoton to refrain from transferring any of the gas leases and from issuing or transferring any of its capital stock. After a hearing, the District Court refused to grant the preliminary injunction, on the ground that there had not been shown any basis for the relief sought by the Commission.

On appeal, the Court of Appeals for the Third Circuit affirmed the judgment of the District Court on the ground that § 1 (b) of the Natural Gas Act, excluding "the production or gathering of natural gas" from the Commission's jurisdiction, left the transfer of gas leases to state regulation and outside the scope of the Commission's regulatory powers. 172 F. 2d 57. The State Corporation Commission of Kansas had been granted leave to intervene in the Court of Appeals in opposition to the Federal Power Commission.

To consider the important question of the applicability of the Natural Gas Act to this transaction, we granted certiorari. 336 U. S. 935.

Without entering upon another review of its legislative history,[2] suffice it to say that the Natural Gas Act did not envisage federal regulation of the entire natural-gas field to the limit of constitutional power. Rather it con-

---

[2] The legislative history has been discussed by our prior opinions in *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n of Indiana*, 332 U. S. 507, 514–521; *Interstate Natural Gas Co.* v. *Federal Power Comm'n*, 331 U. S. 682, 689–690; *Colorado Interstate Gas Co.* v. *Federal Power Comm'n*, 324 U. S. 581, 601–603; *Federal Power Comm'n* v. *Hope Natural Gas Co.*, 320 U. S. 591, 609–613; *Illinois Natural Gas Co.* v. *Central Illinois Pub. Serv. Co.*, 314 U. S. 498, 506–508.

templated the exercise of federal power as specified in the Act, particularly in that interstate segment which the states were powerless to regulate because of the Commerce Clause of the Federal Constitution.[3] The jurisdiction of the Federal Power Commission was to complement that of the state regulatory bodies.[4] Accordingly, Congress in § 1 (b) of the Act not only prescribed the intended reach of the Commission's power, but also specified the areas into which this power was not to extend. Section 1 (b) provides as follows:

"(b) The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

"This section determines the Act's coverage and does so in the light of the situation existing at the time. Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale." *Panhandle Eastern Pipe Line Co.* v. *Public Service Com-*

---

[3] See. H. R. Rep. No. 2651, 74th Cong., 2d Sess., pp. 1–3; H. R. Rep. No. 709, 75th Cong., 1st Sess., pp. 1–4; S. Rep. No. 1162, 75th Cong., 1st Sess., pp. 1–3.

[4] See *Public Utilities Comm'n* v. *United Fuel Gas Co.*, 317 U. S. 456, 467; *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n*, 332 U. S. 507, 517–518.

*mission of Indiana,* 332 U. S. 507, 516. The Act, more-
over, expressly exempts from its coverage [5] (1) any other
transportation or sale of natural gas; (2) the local distri-
bution of natural gas; (3) the facilities used for local
distribution; and (4) the production and gathering of
natural gas.

The Commission seeks to distinguish between the ac-
tivities of production and gathering, such as drilling,
spacing wells, or collecting gas, and the facilities, such
as reserves and gas leases, used therefor and argues that
only the former were excluded from the coverage of the
Act. In support of this position it is pointed out that
the section specifically exempts both the local distribution
and the facilities used therefor, while it makes no mention
of the facilities used for production or gathering.[6] In
the face of the unambiguous language of the Act and
its legislative background, we cannot ascribe such a
narrow meaning to the words, "the production or gather-
ing of natural gas." In *Colorado Interstate Gas Co.* v.
*Federal Power Commission,* 324 U. S. 581, 603, we said

---

[5] The House report on the Act, after quoting the exemption pro-
visions of § 1 (b), says: "The quoted words are not actually neces-
sary, as the matters specified therein could not be said fairly to be
covered by the language affirmatively stating the jurisdiction of the
Commission, but similar language was in previous bills, and, rather
than invite the contention, however unfounded, that the elimination
of the negative language would broaden the scope of the act, the
committee has included it in this bill." H. R. Rep. No. 709, 75th
Cong., 1st Sess., p. 3.

[6] Actually, in the words of the House report, "That part of the
negative declaration stating that the act shall not apply to 'the local
distribution of natural gas' is surplusage by reason of the fact that
distribution is made only to consumers in connection with sales, and
since no jurisdiction is given to the Commission to regulate sales
to consumers the Commission would have no authority over distri-
bution, whether or not local in character." H. R. Rep. No. 709,
75th Cong., 1st Sess., p. 3.

that this phrase comprehended the producing properties and gathering facilities of a natural-gas company. We now adhere to this natural and clear meaning of the words and their obvious expression of congressional intent.[7] Of course leases are an essential part of production.

The Commission cites §§ 5 (b), 6 (a) and (b), 8 (a), 9 (a), 10 (a), and 14 (b) to show that Congress intended "to confer a certain measure of authority upon the Commission" over the production and gathering of gas. These sections empower the Commission to make investigations, to prescribe rules for the keeping of accounts and records by the natural-gas companies, and to require that the companies file such reports as are deemed necessary by the Commission in the proper administration of the Act. These powers are inquisitorial in nature and were designed to aid the Commission in exercising its powers and "to serve as a basis for recommending further legislation to the Congress." Section 14 (b), quoted below, comes closest to supporting the Commission's argu-

---

[7] In a brief prepared by the Solicitor of the Federal Power Commission for the House Committee on Interstate and Foreign Commerce on the constitutionality of H. R. 11662, an earlier bill substantially similar to the Natural Gas Act, the following appears as part of the analysis of the bill: "The bill makes no attempt to regulate the production or gathering facilities of a natural-gas company, this function being purely local in character, nor is any attempt made to exercise control over distribution facilities." Hearings before a subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 11662, 74th Cong., 2d Sess., p. 17.

The Solicitor of the Federal Power Commission in testifying at the same hearing also answered the following question:

"Mr. COLE [Member of Committee]. Does this bill give anywhere the Commission power over the source of natural gas in the different fields in a manner which we might call comparable to that which your Commission now has over hydroelectric generating plants?

"Mr. DeVANE [Solicitor of the F. P. C.]. It does not; no. It does not attempt to regulate the gathering rates or the gathering business. Section 11, I believe it is, of the bill deals with that." P. 34.

ment but that confers only power to obtain information.[8] Although these sections bear evidence of congressional consideration of the relationship of production properties to other elements of the natural-gas business, they do not even by implication suggest to us an extension of the regulatory provisions of the Act to cover incidents connected with the production or gathering of gas.

In *Colorado Interstate Gas Co.* v. *Federal Power Commission, supra,* at 602, the Court in considering the more important of these sections said that they described powers which were aids to the "normal conventions" of rate making. We held that the Commission in exercising its rate-making authority could include the fair value of the producing and gathering facilities in the rate base of a natural-gas company. The primary duty of the Commission is to fix just and reasonable rates for the transportation and sale of natural gas in interstate commerce for resale. For this purpose the Court permitted the Commission to examine and consider the cost of production and gathering. The use of such data for rate making is not a precedent for regulation of any part of production or marketing. Before the *Colorado Interstate* decision, it was apparent that the value of producing facilities and the cost of gas bought by a

---

[8] "(b) The Commission may, after hearing, determine the adequacy or inadequacy of the gas reserves held or controlled by any natural-gas company, or by anyone on its behalf, including its owned or leased properties or royalty contracts; and may also, after hearing, determine the propriety and reasonableness of the inclusion in operating expenses, capital, or surplus of all delay rentals or other forms of rental or compensation for unoperated lands and leases. For the purpose of such determinations, the Commission may require any natural-gas company to file with the Commission true copies of all its lease and royalty agreements with respect to such gas reserves."

See H. R. Rep. No. 709, 75th Cong., 1st Sess., p. 7.

natural-gas company from producers would be weighty factors in rate making whether a rate-base method or other method for fixing rates was used. Low valuation by the Commission of producing properties or low-cost allowance for purchased gas discourages exploration for gas or its sale in interstate commerce.[9] Congress knew this necessary relationship between production and distribution but excluded the Commission from exercising any direct control or regulation over the actual production and gathering of natural gas.

The Commission urges it has jurisdiction over the transaction between Panhandle and Hugoton from the powers granted to it by § 7 (c) of the Act which authorizes it to issue certificates of convenience and necessity for the interstate transportation and sale of natural gas and those granted to it by §§ 4 and 5 to determine reasonable rates for such transportation and sale. It is pointed out that Panhandle in three applications for certificates of convenience and necessity to construct additional pipeline facilities had included the acreage here involved as part of its gas reserves, and certificates were issued upon the finding by the Commission that Panhandle had adequate reserves to warrant its expansion.[10] Moreover Panhandle had been permitted to include these reserves in its rate base as "used and useful property." The Commission, therefore, argues that these gas leases which Panhandle proposes to grant to Hugoton have been dedicated to the discharge of Panhandle's public-utility obligation to render adequate service at reasonable and nondiscriminatory rates. From these circumstances, the

---

[9] *Colorado Interstate Gas Co. v. Federal Power Comm'n,* 324 U. S. 581, 603; *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U. S. 591, 610, 612.

[10] 5 F. P. C. 544, 546, 949, 952; F. P. C. Docket G–876, Order of June 10, 1948.

Commission concludes that these leases cannot be relinquished by Panhandle without the consent of the Commission, which has the implied power to protect its rate-making function and to insure the maintenance of adequate service by a natural-gas company. Sections 4, 5 and 7 do not concern the producing or gathering of natural gas; rather they have reference to the interstate sale and transportation of gas and are so limited by their express terms. Thus §§ 4 (a), (b), (c), 5 (a) and 7 (c) speak of "transportation or sale of natural gas subject to the jurisdiction of the Commission" while § 7 (a) and (b) refer respectively to "transportation facilities" and "facilities subject to the jurisdiction of the Commission." [11] Nothing in the sections indicates that the power given to the Commission over natural-gas companies by § 1 (b) could have been intended to swallow all the exceptions of the same section and thus extend the power of the Commission to the constitutional limit of congressional authority over commerce. The repetition of the words "subject to the jurisdiction" makes clear to us the intent to keep the Commission's hands out of the excepted local matters. The same answer applies to petitioner's argument that § 16 gives it authority to stop sales of leases.[12] The power to do the things appropriate to carry out the provisions of the Act can hardly be taken to rescind a prohibition against certain actions.

The Federal Power Commission leans heavily upon § 7 (b), which provides that no natural-gas company may abandon any of its facilities subject to the jurisdiction

---

[11] *Colorado Interstate Gas Co.* v. *Federal Power Comm'n*, 324 U. S. 581, 598.

[12] "Sec. 16. The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act. . . ."

of the Commission without the prior approval of the Commission.[13]  The argument here is that since natural gas is the "lifeblood" of a pipe-line system, a company by disposing of its gas reserves, unhampered by Commission control, may render itself unable to continue service; consequently abandonment of facilities and service without the consent of the Commission will result. The argument begs the question.  The section, like those above, covers only "facilities subject to the jurisdiction of the Commission."

To accept these arguments springing from power to allow interstate service, fix rates, and control abandonment would establish wide control by the Federal Power Commission over the production and gathering of gas. It would invite expansion of power into other phases of the forbidden area.[14]  It would be an assumption of powers specifically denied the Commission by the words of the Act as explained in the report and on the floor of both Houses of Congress.[15]  The legislative history

---

[13] "(b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment."

[14] Would it soon be contended that statutory power to require extension of service, § 7 (a), included power to require exploration or acquisition of leases or allocation of production to interstate pipe lines in order to serve the public interest?

[15] The report of the House Committee on Interstate and Foreign Commerce on H. R. 6586, 75th Cong., 1st Sess., which became the Natural Gas Act, was adopted without change by the Senate Committee on Interstate Commerce as its report on the same bill.  See note 3, supra.  The following excerpts are taken from the report as particularly pertinent:

"The bill is substantially identical with H. R. 12680 which, as

amended, was reported by the Committee on Interstate and Foreign Commerce of the Seventy-fourth Congress, second session, with a recommendation that it pass. If enacted, the present bill would for the first time provide for the regulation of natural-gas companies transporting and selling natural gas in interstate commerce. It confers jurisdiction upon the Federal Power Commission over the transportation of natural gas in interstate commerce, and the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use. The States have, of course, for many years regulated sales of natural gas to consumers in intrastate transactions. The States have also been able to regulate sales to consumers even though such sales are in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. (See *Pennsylvania Gas Co.* v. *Public Service Commission* (1920), 252 U. S. 23.) There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction. However, in the case of sales for resale, or so-called wholesale sales, in interstate commerce (for example, sales by producing companies to distributing companies) the legal situation is different. Such transactions have been considered to be not local in character and, even in the absence of Congressional action, not subject to State regulation. (See *Missouri* v. *Kansas Gas Co.* (1924), 265 U. S. 298, and *Public Utilities Commission* v. *Attleboro Steam & Electric Co.* (1927), 273 U. S. 83.) The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act.

". . . The bill takes no authority from State commissions, and is so drawn as to complement and in no manner usurp State regulatory authority, and contains provisions for cooperative action with State regulatory bodies. . . .

"Your committee believes that this legislation is highly desirable to fill the gap in regulation that now exists by reason of the lack of authority of the State commissions." H. R. Rep. No. 709, 75th Cong., 1st Sess., pp. 1–3.

During the debate on the bill in the House, its sponsor, Chairman Lea of the Committee on Interstate and Foreign Commerce, made the following explanatory statements:

"The primary purpose of the pending bill is to provide Federal regulation, in those cases where the State commissions lack authority, under the interstate-commerce law. This bill takes nothing from the State commissions; they retain all the State power they have at the present time. This bill would apply to the transportation of natural gas in interstate commerce and to the sale of natural gas in interstate commerce for resale or public consumption.

"The bill does not apply to the production and gathering of gas." 81 Cong. Rec. 6721.

Likewise on the floor of the Senate, Chairman Wheeler of the Committee on Interstate Commerce gave a similar interpretation to the Act:

"Mr. AUSTIN. Mr. President, may I ask the Senator from Montana [Mr. Wheeler] a question concerning this bill? Does the bill undertake to regulate the production of natural gas, or does it undertake to regulate the producers of natural gas?

"Mr. WHEELER. It does not attempt to regulate the producers of natural gas or the distributors of natural gas; only those who sell it wholesale in interstate commerce. . . .

"Mr. AUSTIN. Mr. President, will the Senator yield for one other inquiry?

"Mr. WHEELER. Yes.

"Mr. AUSTIN. Is the bill limited in its scope to the regulation of transportation?

"Mr. WHEELER. Yes; it is limited to transportation in interstate commerce, and it affects only those who sell gas wholesale.

"Mr. KING. Mr. President, I should like to obtain information from the Senator as to the implications that arise from the bill, and what States it would affect. As an illustration, if gas is produced in Wyoming and is transported for consumption into the Senator's State or my State, would the Federal Power Commission have to do with such an activity?

"Mr. WHEELER. No; and let me say to the Senator that, as a matter of fact, the bill does not interfere with the State regulation, in any way, shape, or form." 81 Cong. Rec. 9312.

"Mr. CONNALLY. Is it not also true, even though the utility commissioners advocate it, that whenever a Federal agency takes over an activity such as this the State authorities begin to shift or lose

of this Act is replete with evidence of the care taken by Congress to keep the power over the production and gathering of gas within the states.[16]   This probably occurred because the state legislatures, in the interests of conservation, had delegated broad and elaborate power to their

their responsibility?  If we turn this over to the Interstate Commerce Commission, essentially what they do will be reflected all over the country, because the interstate rates will be superimposed on the State commissions and they must necessarily be governed by them.   Did not that happen to the railroads?   ·

"Mr. WHEELER. There is no doubt about that, but this is an entirely different situation.

"Mr. CONNALLY. Yes.; one involves the railroads and the other involves gas.

"Mr. WHEELER. No.  There is no attempt and can be no attempt under the provisions of the bill to regulate anything in the field except where it is not regulated at the present time.   It applies only as to interstate commerce and only to the wholesale price of gas." 81 Cong. Rec. 9313.

· "Mr. AUSTIN. Then, it would leave to the future the right to meet any effort on the part of the central government to acquire the natural resources of the State of Montana, or the State of Vermont, or any other State?

"Mr. WHEELER. Oh, yes.  It does not touch it in any way, shape, or form, except to require the furnishing of information.

"Mr. AUSTIN. I have great fear of these occult methods of acquiring the natural resources of our several States."   81 Cong. Rec. 9314.

[16] While Congress was considering the passage of the Natural Gas Act, a bill (H. R. 5711 and S. 1919, 75th Cong., 1st Sess.) was introduced in both houses of Congress on March 17, 1937, which provided that "this Act shall apply to the procurement of natural gas for the purpose of its transmission through pipe lines and its sale, exchange, transmission, or distribution in interstate commerce . . . ."   The jurisdiction of the Federal Power Commission was defined as follows:

"The [Federal Power] Commission shall have jurisdiction over all facilities for the procurement of natural gas for its transmission through pipe lines and its sale, or for exchange, or distribution in interstate commerce, and over the transmission of natural gas in pipe lines in interstate commerce and over the sale, or exchange of natural gas in interstate commerce, and over all facilities connected

regulatory bodies over all aspects of producing gas.[17]  The Natural Gas Act was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry.[18]  Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other.[19]  Congress enacted this Act after full consideration of the problems of production and distribution.  It considered the state interests as well as the national interest. It had both producers and consumers in mind.  Legislative adjustments were made to reconcile the conflicting views.

The District Court found as a fact, and the finding is undisputed by the Commission, that, "It has been the practice in the natural gas industry for companies to trade freely in gas leases, and the Commission has never heretofore asserted the right to regulate transfers of such leases."  Thus for over ten years the Commission has never claimed the right to regulate dealings in gas acreage.  Failure to use such an important power for so long a time indicates to us that the Commission did not believe the power existed.[20]  In the light of that history we should

therewith as parts of a system of natural-gas transmission operated in more than one State."

The provisions of this bill, however, failed of adoption; instead Congress enacted § 1 (b) with its specific exemptions from the coverage of the Act.

[17] See, for example, Kansas Gen. Stat., §§ 55–701 to 55–713 (1947 Supp.) ; Mich. Stat. Ann., c. 97, §§ 13.138 (1)–13.140 (10) (Supp. 1947) ; Okla. Stat. Ann., tit. 52, c. 3, §§ 81–247; Texas Rev. Civ. Stat., tit. 102, Art. 6008 *et seq.* (Vernon, 1925, with Supp. 1948) ; La. Gen. Stat. §§ 4766–4826.2.

[18] *Public Utilities Comm'n* v. *United Fuel Gas Co.,* 317 U. S. 456, 467.

[19] *Interstate Natural Gas Co.* v. *Federal Power Comm'n,* 331 U. S. 682, 690.

[20] *Federal Trade Comm'n* v. *Bunte Brothers,* 312 U. S. 349, 352; *Norwegian Nitrogen Prod. Co.* v. *United States,* 288 U. S. 294, 315.

not by an extravagant, even if abstractly possible, mode of interpretation push powers granted over transportation and rates so as to include production. If possible, all sections of the Act must be reconciled so as to produce a symmetrical whole.[21] We cannot attribute to Congress the intent to grant such far-reaching powers as implicit in the Act when that body has endeavored to be precise and explicit in defining the limits to the exercise of federal power.[22]

The Commission sought by injunction to enforce its order halting the transaction between Panhandle and

---

[21] *Colorado Interstate Gas Co.* v. *Federal Power Comm'n*, 324 U. S. 581, 602.

[22] Section 5 (b) reads:

"(b) The Commission upon its own motion, or upon the request of any State commission, whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transportation of natural gas *by a natural-gas company* in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas."

When the provisions of the bill which became the Natural Gas Act were being read for amendment on the floor of the House, § 5 (b) was amended by inserting the italicized words. Mr. Boren, a member of the House Committee on Interstate and Foreign Commerce, who submitted this amendment, explained the purpose of it as follows:

"Mr. BOREN. Mr. Chairman, my amendment has been agreed to by the committee. I offer the amendment in order to keep the jurisdiction of the Federal Government as clearly defined as possible from the jurisdiction of the State government in cases arising under the provisions of this bill.

"During the hearings I offered this amendment and made the following statement:

" 'Mr. Chairman, I would like to make this observation for the record and as a challenge to the proponents of this bill: That subsection B of section 5 provides for a growth and for the extension of the influence of a Federal bureau, or commission, in a realm

Hugoton pending the outcome of its investigation. ·The Commission argues that, at any rate, the transfer should be enjoined until it can determine its own power and the necessity of using it. Injunctive aid was requested under § 20 (a)[23] of the Act and the general equity power of the District Court. To be entitled to judicial assistance, however, the order issued by the Commission must be valid and based on a statutory grant of power to the Commission. As we have held above that the transfer of undeveloped gas leases is an activity related to the production and gathering of natural gas and beyond the coverage of the Act, the authority. of the Commission cannot reach the sales. A proposed transfer cannot be stopped by the Commission. It should not be permitted to delay what it cannot prevent.[24] .If the Commission is of the opinion that it should have power to control the

---

wherein this proposal submits on its own acknowledgment that the Federal authority and responsibility does not rightfully exist.'

"Mr. Chairman, this amendment ·clarifies the jurisdiction as between the Federal and State governments, and assures us that the Federal Government will not go into a realm where the State government already has proper authority to handle the problem.

"The committee has approved the amendment, and I have nothing further to say." 81 Cong. Rec. 6728.

[23] "Sec. 20. (a) Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this Act, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, the District Court of the United States for the Dis-. trict of Columbia, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this Act or any rule, regulation, or order thereunder, . . . ."

[24] Cf. *Public Utilities Comm'n* v. *United Fuel Gas Co.*, 317 U. S. 456, 468.

disposition of leases by natural-gas companies, it is authorized to call the attention of Congress to that fact.[25]

The judgment of the Court of Appeals is accordingly

*Affirmed.*

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE concur, dissenting.

The Court's judgment and opinion in this case go far toward scuttling the Natural Gas Act. 52 Stat. 821, as amended, 56 Stat. 83. In that Act Congress declared it "necessary in the public interest" for the Federal Government to regulate natural-gas companies engaged in.

---

[25] In an analogous situation before the institution of this litigation, there had been uncertainty of opinion in the Commission as to the reach of the Act toward sales by independent producers and gatherers to natural-gas companies for transportation in interstate commerce. See reports of the Federal Power Commission on its Natural Gas Investigation (Docket No. G–580), transmitted to Congress on April 28, 1948. In Part IV of the report subscribed to by Commissioners Smith and Wimberly, it is concluded at pp. 38 and 40:

"No reasonable basis is found in the Act or its legislative history for a conclusion that, although the 'activities' of production and gathering are exempt under Section 1 (b), sales of natural gas which are made at arm's length by producers and gatherers who do not thereafter transport it in interstate commerce may be regulated. Unless such a distinction is specifically disclaimed, doubts and uncertainties will continue to be felt and expressed regarding the possible jurisdiction under the Natural Gas Act of those who only produce and gather natural gas and then sell it to others transporting such gas in interstate commerce." Pp. 38–39.

"In view of the present unsettled state of this matter, it is desirable, as the Commission has heretofore recommended, that the Congress should adopt appropriate amendatory legislation to make it clear that independent producers or gatherers of natural gas, and their sales thereof to interstate pipe lines, are not subject to the provisions of the Natural Gas Act. Such action will confirm what clearly ap-

the interstate transportation and sale of natural gas. Many sections of the Act detailed the authority granted the Federal Power Commission to regulate such companies and in addition § 16 granted broad congressional authority to the Commission "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as . . . necessary or appropriate to carry out the provisions" of the Act. Today's opinion interprets this Act as denying the Commission all authority to perform any action or issue any order to regulate an interstate company's interest in natural-gas properties. This interpretation deprives the Commission of the power to discharge its congressionally imposed duty to protect the public interest.

The Court's sterilizing interpretation rests on an exception to Commission authority appearing in § 1 (b) of the Act.[1]  That exception provides that the Act shall not

pears to have been the original intent of Congress when it enacted the Natural Gas Act in 1938." Pp. 40–41.

See also the report subscribed to by Commissioners Olds and Draper, pp. 12–14.

Congress is now giving consideration to this problem. See H. R. 79, H. R. 1758, H. R. 982, S. 1498, and S. 1831, 81st Cong., 1st Sess., and committee hearings thereon.

[1] Today's opinion also relies on a "finding of fact" by the District Court that the Commission had never heretofore "asserted the right to regulate transfers of such leases." The majority opinion views this "finding" as an evidence that for ten years "the Commission did not believe the power existed." But this "finding" of fact rests only on affidavits offered in respect to a motion for a preliminary injunction and should not be utilized as a prop to support the Court's interpretation of the Act. Moreover, the Commission points out that until the present time no such trading as is involved here had taken place. The Commission states in its brief that the finding of fact "does not reflect the full picture. Until this time, such trading has taken place with the view of blocking in reserves and improving service, and so far as the Commission is presently aware, not to achieve results which would derogate from the Commission's jurisdiction "

apply to "the production or gathering of natural gas." I agree with the Court that this language is "unambiguous" and that this Court should give the language its "natural and clear meaning." "Production" of gas would thus mean the act of bringing forth gas from the earth, and "gathering" would mean the act of collecting gas after it has been brought forth. Such are the "natural and clear" meanings we had heretofore attributed to these word symbols. *Colorado Interstate Gas Co.* v. *Comm'n,* 324 U. S. 581, 597–604; *Interstate Gas Co.* v. *Power Comm'n,* 331 U. S. 682, 689–691. It was the physical acts incident to the "production and gathering" of gas— local activities—that our prior decisions emphasized Congress intended to leave states free to regulate. Today the Court reads this congressionally granted privilege of states to regulate the act of "production" as an absolute bar to the Federal Power Commission's regulation of the ownership of gas-reserve properties. Gas reserves are indispensable to proper service of interstate customers of an interstate natural-gas company. And in thus limiting the Commission's jurisdiction the Court leaves the Commission impotent to protect the public's interest in having interstate companies maintain adequate gas reserves. This disabling interpretation reads the Federal Act as though it contemplated "ineffective regulation," an interpretation directly opposed to that we gave the Act in *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 520.

Section 7 (e) of the Act requires the Commission to issue certificates of convenience and necessity only if an interstate company is "able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder . . . ." As authorized by § 7 (d), the Commission requires appli-

cants for certificates to show "the gas reserves which are to supply the market which is proposed to be served." [2] And § 7 (b) denies a company power to "abandon all or any portion of its facilities subject to the jurisdiction of the Commission . . . ." If evidence were needed to show the importance Congress attributed to the gas reserve facilities of a company, that evidence appears in §§ 7 (b), 7 (c) and 7 (e). Jurisdiction to regulate a natural-gas company without jurisdiction to regulate its gas reserves would be like granting jurisdiction to regulate railroads without power to regulate the tracks, routes, rights-of-way, etc. And we have held that the Commission has jurisdiction under the Natural Gas Act to consider the gas-producing properties in fixing rates. *Colorado Interstate Co.* v. *Federal Power Commission,* 324 U. S. 581; *Panhandle Co.* v. *Power Comm'n,* 324 U. S. 635, 648–649.

The respondent company had its rate base fixed and its ability to serve the public determined on its claim to ownership of the very gas reserve properties the Court now permits it to sell to an affiliate over the protest of the Commission. According to allegations in the Commission's complaint the respondent gas company has already received from its customers large sums of money from rates which reflected expenses incurred in maintaining these reserves and for exploration and development costs in relation to them. But under the Court's holding today, these properties, increased in value by consumer contributions, can be given away by the respondent company to its newly formed affiliate. Congress could not have intended to render the Commission powerless to protect gas reserves necessary to continued consumer service and paid for by rates fixed to allow development of the reserves.

---

[2] § 57.5 (f) of the Commission's Order No. 99 (7 Fed. Reg. 6844).

Furthermore the reserves, costing only $160,000, have now apparently been capitalized by the respondent's affiliated "purchaser" at $10,000,000. If the gas reserves continue to be held by the respondent company the rates will be fixed on the basis of the original $160,000 cost. *Panhandle Co. v. Power Comm'n,* 324 U. S. 635, 648. It is at least doubtful whether after today's holding the company can be prevented from hereafter charging rates based on the $10,000,000 inflated valuation. Thus the unwholesome practices that the Natural Gas Act was primarily designed to prevent are given a new lease on life. For a purpose of the Act was to protect consumers and one of the evils it was aimed to prevent was the holding company technique of transfers and retransfers between parent corporations, their offsprings and affiliates. *Federal Power Comm'n* v. *Hope Gas Co.,* 320 U. S. 591, 610.

It seems inconceivable that Congress would have passed an Act to regulate natural-gas companies with a wholly neutralizing exception to bar regulation of the gas reserves upon which the whole gas business depended. I cannot attribute such a meaningless and deceptive action to the Congress. While the Act itself grants broad Commission powers effectively to regulate gas companies, the Court's interpretation deprives the Commission of power essential to fixing fair rates and to protecting continued services during the life of a company's gas reserves.

Today's opinion regards Congress' action like that of a parent who ordered his offspring to go swimming with a stern admonition not to go near the water.

I would reverse.