COLLEGE OF AMERICAN PATHOLO-
GISTS, et al., Appellants,

v.

Margaret M. HECKLER, Secretary,
Department of Health & Human
Services, Appellee.

No. 83–1706.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 27, 1984.

Decided May 11, 1984.

Jack R. Bierig, Chicago, Ill., with whom Benjamin W. Heineman, Jr., Washington, D.C., was on the brief, for appellants.

David B. Palmer, Atty. Dept. of Health & Human Services, Washington, D.C., with whom Juan A. Del Real, Gen. Counsel, Dept. of Health & Human Services, Washington, D.C., was on the brief, for appellee. Royce C. Lamberth, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Nathalie P. Gilfoyle, Washington, D.C., with whom Timothy J. Waters and Jeffrey N. Martin, Washington, D.C., were on the brief for amicus curiae, The American Soc. for Medical Technology, urging affirmance.

Douglas R. Carlson, Chicago, Ill., was on the brief for amicus curiae, American Medical Ass'n, urging reversal.

Thomas L. O'Brien, Chicago, Ill., was on the brief for amicus curiae, American Bd. of Pathology, urging reversal.

Robert L. McCarty and Michael N. McCarty, Washington, D.C., were on the brief for amicus curiae, American Medical Technologists, urging affirmance.

Jeffrey P. Altman, Washington, D.C., was on the brief for amicus curiae, American Soc. of Clinical Pathologists, urging reversal.

Before WALD and MIKVA, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellants, a professional organization of pathologists and three individual pathologists, challenge regulations promulgated by the Department of Health and Human Services (HHS) that establish, *inter alia,* the qualifications for Medicare reimbursement for services rendered by clinical pathologists in hospital laboratories. The district court refused to enjoin the regulations and granted summary judgment in favor of HHS. Although the Secretary's regulations do not reflect ideal drafting precision, we nonetheless find appellants' numerous challenges without merit, and therefore affirm.

## I. BACKGROUND

In 1965, Congress enacted a federal health insurance program, commonly known as Medicare. 42 U.S.C. §§ 1395–1395pp (1976). The Medicare program is composed of two distinct, mutually exclusive parts. Part A provides insurance for hospital and hospital-related services. 42 U.S.C. §§ 1395c–1395i. Part B provides insurance for supplemental medical services, such as services by a physician. 42 U.S.C. §§ 1395j–1395w. Under Part A, providers are reimbursed on the basis of *reasonable cost.* Under Part B, physicians are reimbursed on the basis of *reasonable charge.* Because Part B payments usually are greater than Part A payments, a significant difference in compensation turns on whether a service is compensated under Part A or Part B.

One Part A/Part B designation that has generated substantial controversy is that affecting hospital-based physicians, such as pathologists, radiologists, and anesthesiologists. The Secretary and the medical profession previously have locked horns over the extent to which medical services rendered in hospital laboratories are compensable under Part B. HHS has not always been successful in its attempts to draw these lines. *See, e.g., Arkansas Society of Pathologists v. Harris,* MEDICARE & MEDICAID GUIDE (CCH) ¶ 30,546 (E.D.Ark.1980).

In 1982, Congress addressed this controversy and, as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub.L. No. 97–248, 96 Stat. 324, required HHS to develop criteria to distinguish between services reimbursable under Part B and services reimbursable under Part A. In pertinent part, the statute provided:

The Secretary shall by regulation determine criteria for distinguishing those services (including inpatient and outpatient services) rendered in hospitals or skilled nursing facilities—

(A) which constitute professional medical services, which are personally rendered for an individual patient by a physician and which contribute to the diagnosis or treatment of an individual patient, and which may be reimbursed as physicians' services under part B, and

(B) which constitute professional services which are rendered for the general benefit to patients in a hospital or skilled nursing facility and which may be reimbursed only on a reasonable cost basis.

Sec. 1887(a)(1) of the Medicare Act [42 U.S.C. § 1395xx(a)(1)] (hereafter referred to as Section 1887 or the TEFRA amendment). *See also* CONFERENCE COMM. ON TAX EQUITY FISCAL RESPONSIBILITY ACT OF 1982, H.REP. No. 760, 97th Cong., 2d Sess. (1982).

Pursuant to this statutory directive, HHS published proposed regulations and, after reviewing over 3500 substantive comments, promulgated the final regulations on March 2, 1983. 48 Fed.Reg. 8901 (1983). These regulations address a broad spectrum of issues that relate to payment under the Medicare Act, including the criteria physicians in specified medical specialties must meet to receive Part B payments.

Appellants challenge the criteria insofar as they affect clinical pathologists based in hospitals or in other institutions. Clinical pathology involves the laboratory examination of body fluids, e.g. blood. Not at issue here are those regulations that establish the compensatory scheme for anatomical pathology, that branch of medicine that involves the analysis of human tissue.

To qualify for Part B payment, clinical pathologists must surmount three regulatory hurdles. The first is 42 C.F.R. § 405.550(b) (1983), which provides:

The carrier will pay for services of physicians to patients of providers on a reasonable charge basis only if the following requirements are met:

(1) The services are personally furnished for an individual patient by a physician;

(2) The services contribute directly to the diagnosis or treatment of an individual patient;

(3) The services ordinarily require performance by a physician; and

(4) In the case of ... laboratory services, the additional requirements in ... 405.556 must be met.

Because clinical pathology is a laboratory service, it is subject to the requirements of 42 C.F.R. § 405.556 (1983), referred to in paragraph 4 above. That section provides:

The carrier will reimburse laboratory services furnished by a physician to an individual inpatient on a reasonable charge basis only if the services meet the conditions for reasonable charge payment in § 405.550(b) and are—

(1) Anatomical pathology services;

(2) Consultative pathology services that meet the requirements in paragraph (b) of this section; or

(3) Services performed by a physician in personal administration of test devices, isotopes, or other materials to an individual patient.

And pursuant to the reference in paragraph 2 above, consultative pathology services must:

(1) Be requested by the patient's attending physician;

(2) Relate to a test result that lies outside the clinically significant normal or expected range in view of the condition of the patient;

(3) Result in a written narrative report included in the patient's medical record; and

(4) Require the exercise of medical judgment by the consulting physician.

42 C.F.R. § 405.556(b) (1983). These three sections provide the principal regulatory format for clinical pathologists. The regulations also limit the pathologist's ability to secure Part B payments for the operating costs of hospital laboratories, and his or her ability to seek certain payments outside the Medicare program.

## II. Discussion

### A. *Subject Matter Jurisdiction*

The threshold question presented is whether the district court had jurisdiction to entertain appellants' complaints. The Secretary argues that the district court was deprived of federal question jurisdiction, 28 U.S.C. § 1331(a), by section 205(h) of the Social Security Act, 42 U.S.C. § 405(h), and/or by the "implied preclusion of review" theory embraced by the Supreme Court in *United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). We find neither argument persuasive.

In the first prong of her jurisdictional attack, the Secretary relies on section 205(h) of the Social Security Act. 42 U.S.C. § 405(h) (1976). This section, incorporated by reference into the Medicare Act through 42 U.S.C. § 1395ii (1976), states:

> The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reversed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.*

42 U.S.C. § 405(h) (emphasis added). The precise extent of this section's jurisdictional prohibition has been the focus of much recent litigation. *See, e.g., Starnes v. Schweiker,* 715 F.2d 134 (4th Cir.1983), *cert. granted __ U.S. __,* 104 S.Ct. 2673, 81 L.Ed.2d 870 (1984); *National Association of Home Health Agencies v. Schweiker,* 690 F.2d 932 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983).

■ A recent case in this circuit, however, rebuffs this jurisdictional attack. In *Home Health Agencies, supra,* we engaged in an exhaustive analysis of section 405(h), its legislative history, and the relevant case law. Nothing would be gained by rehashing that analysis today. The *Home Health Agencies* conclusion, however, controls our decision. There, we rejected the Secretary's broad reading of section 405(h), and instead held that "Congress ... did not intend to preclude judicial review of claims for which no alternative form of judicial review was available." 690 F.2d at 941. Section 405(h) thus allows the exercise of federal question jurisdiction unless an alternative route of judicial review is available.

Applying that standard here, we conclude that section 405(h) does *not* override the federal question jurisdiction otherwise conferred by 28 U.S.C. § 1331(a). Despite the voluminous nature of her brief, the Secretary fails to identify any alternative routes by which appellants can secure judicial review. Nor does the Secretary allege that such a path exists. And our independent review of the statutory framework reveals no alternative avenue of redress. Absent such an alternative, section 405(h) does not block the district court's jurisdiction.

The Secretary's second jurisdictional argument is anchored in *United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982), where the Supreme Court held that a congressional intent to foreclose judicial review of amount determinations under Part B of the Medicare Act was implicit in the statutory scheme and explicit in the Act's legislative history. The Secretary argues that this same "implied preclusion of review" analysis applies to, and controls, this case. We disagree.

■ We begin our analysis with the well established presumption that judicial review is available absent a clear congressional intent to the contrary. *See, e.g., Dunlop v. Backowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Home Health Agencies, supra,* 690 F.2d at 941 & n. 61. A careful review of the Court's rationale in *Erika* indicates why we cannot utilize that case here to overcome the presumption of reviewability. In *Erika,* a distributor of kidney dialysis supplies

sought judicial review of an adverse determination of Part B payments. The Court concluded that Congress intended to foreclose review of such claims. To reach this conclusion, the Court first noted that the Medicare Act allows judicial review of both eligibility and amount determinations under Part A, but allows for review of only eligibility determinations under Part B. The Court then turned to the legislative history and found explicit statements indicating that the omission of language providing for judicial review of Part B amount determinations was intentional. *See, e.g.,* 118 CONG.REC. 33,992 (1972) (congressional desire to "avoid overloading the courts with quite minor matters"). Relying on statements in the legislative history that "unambiguously" supported its conclusion and finding no evidence of a contrary congressional will, the Court concluded that Congress had precluded judicial review of Part B amount determinations.

The Secretary's attempt to extend the *Erika* rationale to the instant case cannot withstand analysis. The touchstone in *Erika,* as in all cases involving the preclusion of judicial review, is congressional intent. Nowhere in *Erika,* however, does the Court discuss or suggest a legislative intent to preclude judicial review of a challenge to the broad regulatory framework adopted by the Secretary. The legislative history cited in *Erika* only reveals an intent to preclude review of Part B *amount* determinations. Nor does the Secretary direct our attention to, or claim the existence of, anything evincing the requisite congressional intent. Instead, the Secretary papers over this critical deficiency by arguing that since both *Erika* and this case may ultimately affect Part B payments, the availability of judicial review should be the same in both situations. Yet, the Secretary points to no supporting legislative history for her position. Such silence certainly cannot substitute for the clear evidence of congressional intent necessary to a conclusion that judicial review has been precluded. Accordingly, we reject the Secretary's argument that Congress intended to pre-clude judicial review of the regulations challenged here.

### B. *Substantive Challenges*

#### 1. *Part B Criteria*

Appellants vigorously argue that the Secretary exceeded her statutory authority when she promulgated regulations that do not permit reimbursement under Part B for *all* services personally rendered by clinical pathologists for individual patients. Thus, appellants contend, the Secretary's actions are "arbitrary, capricious or an abuse of discretion." 5 U.S.C. § 706(2) (1982). In large part, this argument distills to a challenge to the statutory authority of two criteria for Part B reimbursement: the requirement that consultative pathology services be requested by the attending physician, 42 C.F.R. § 405.556(b) (1983) [the "consultation request" requirement], and the requirement that the service rendered be one that "ordinarily require[s] performance by a physician." 42 C.F.R. 405.550(b) (1983) [the "performance" requirement]. Our review of these regulations is guided by Congress' broad mandate to the Secretary to develop standards distinguishing services reimbursable under Part A and services reimbursable under Part B.

■ We find nothing in the "consultation request" requirement that contravenes the TEFRA amendment (section 1887). Under that regulation, a communication initiated by the clinical pathologist may not lead to Part B payment unless the attending physician requests a consultation from the pathologist at some point in the conversation. 48 Fed.Reg. 8933 (1983). The genesis for this regulation is the TEFRA amendment's command that the Secretary develop a means to distinguish services "which contribute to the diagnosis or treatment of an individual patient." Here, the Secretary reasonably decided that the best person to identify those services is the patient's attending physician. The consultation regulation thus permits a flexibility founded on the attending physician's expertise. That is, the physician, best able to gauge his or her own expertise with pathology, is left

free to identify those instances in which a consultation would contribute to the diagnosis of the illness and the subsequent treatment of the patient and those instances in which the laboratory results could be interpreted without the pathologist's aid. Under this scheme, Part B reimbursement is available only for needed advice and not for superfluous and unsolicited communications. This regulatory scheme is reasonable and consistent with the statutory directive that Part B payments be available only for services that contribute to the diagnosis or treatment of a patient.

Moreover, this regulation furthers an additional legislative goal in that it serves to check possible abuses of the Medicare program. As the Secretary explained: "We must be careful to avoid permitting laboratory reports to be described routinely as 'consultations.'" 48 Fed.Reg. 8933 (1983). Otherwise, she implied, routine pathological services could be compensated under Part B and the anticipated cost reductions in the Medicare program would never be realized. If one thing is clear from the legislative history, it is Congress' desire to use the TEFRA amendment as a vehicle to contain the cost of the Medicare program. The Secretary's desire to protect the fisc thus mirrors a similar congressional objective. We accordingly conclude that this regulation is neither unreasonable nor arbitrary and that the Secretary acted within her statutory authority.

Appellants next attack that regulation which limits Part B payments to services that "ordinarily require performance by a physician." *See* 42 C.F.R. § 405.550(b) (1983); *see also* 48 Fed.Reg. 8908 (1983). That regulation, which the Secretary identifies as "essential and necessary" to the statute's implementation, was motivated, at least in part, by a desire "to avoid paying for services at a level appropriate for physicians if those services are frequently and consistently (and more economically) furnished by nonphysicians." 48 Fed.Reg. 8908 (1983). *See also id.* at 8909. The Secretary admits that this requirement is not based on explicit statutory language,

but forcefully argues that it is implicit in the statute and the legislative history.

Appellants respond with equal vigor and contend that the legislative history reveals that Congress considered, but rejected, the precise requirement that the Secretary here imposes. That is, the version of the Bill enacted by the Senate directed the Secretary to develop criteria distinguishing, *inter alia*, "professional medical services ... which require performance by a physician in person." This clause was deleted by the Conference Committee. Thus, the argument continues, the Secretary cannot adopt that which Congress explicitly rejected.

■ Upon a careful review of the statute, regulations, and related legislative history, we conclude that this regulation is valid. The Secretary's actions accurately reflect congressional intent mirrored in the Conference Committee's decision. In introducing the Conference Report on the Senate floor, Senator Dole, Chairman of the Senate Finance Committee, stated:

> While [the Medicare] provision has been slightly modified in conference, the intent in making this change [to the Medicare Act] remains the same. Under the amendment, the Secretary is required to differentiate those *services that require a physician to personally perform* in the diagnosis or treatment of a patient's illness from those *activities that are of a general administrative nature*. General administrative services—such as supervision of personnel who perform clinical laboratory tests—*and those services that do not require a physician to perform in person* are to be reimbursed as a hospital service on a cost basis.

128 CONG.REC. S10,902 (daily ed. Aug. 19, 1982) (emphasis added). The distinction drawn is thus between services that *require* a physician and services that do not. The Secretary's regulation represents a reasonable attempt to give effect to that congressional mandate.

We also review this regulation in the context of the general congressional objective of cost containment, revealed through-

out the legislative history of the TEFRA amendment. The regulation here furthers that objective in that it reduces the incentive for physicians to perform technical work not requiring medical judgment.

Appellants' attempt to attach significance to the Conference Committee's deletion is without substance. Senator Dole's comments on the Senate floor emphasize that the modifications undertaken by the Conference Committee were minor. A decision to eliminate the requirement of personal performance by the physician surely would not be considered as minor. Moreover, the characterization of the deletion as a slight modification lends credence to the district court's alternative interpretation of the deletion: the language could have been removed solely to eliminate a redundancy. The TEFRA amendment allows Part B payments only for professional *medical* services. The inclusion of the term "medical" may itself reflect an intent to limit Part B payments to services ordinarily performed by a physician. Thus, there would be no need for the language deleted by the Conference Committee and the modification would indeed be minor. In light of the absence of any legislative history supporting appellants' explanation of the deletion and Senator Dole's comments on the Senate floor, we agree with the district court that the modification was intended to be insignificant.

To demonstrate the error of the regulations, appellants offer several examples of clinical pathology services that are performed for individual patients but that, under the regulations, may not be reimbursable under Part B. These include blood transfusions and hematology smears. Appellants concede that these services constitute only a small fraction of all activity in a pathology laboratory, but nevertheless argue that the failure to reimburse these services under Part B is contrary to congressional intent. Again, appellants' premise is that Congress intended *all* clinical pathology services personally rendered for an individual patient to be reimbursed under Part B. Yet, as demonstrated above, Congress did not mandate that result.

That the services cited in appellants' examples may not result in Part B payment does not prove infidelity to congressional intent. Appellants' argument also falters because, at least in part, it is based on speculation: on an assumption that certain services will be denied Part B reimbursement. The speculative nature of appellants' examples is revealed in their hematology smear argument. Appellants vigorously argue that the Secretary's failure to reimburse the analysis of hematology smears under Part B demonstrates the regulations' failure to comport with congressional intent. Yet, while this appeal was pending, HHS distributed a letter to regional administrators in which it explained that hematology smears would be treated as anatomical pathology and therefore *would* be reimbursed under Part B. Appellants' primary "horrible example" thus evaporates.

The criteria the Secretary has established to determine those clinical pathology services eligible for Part B reimbursement are reasonable. The regulations comport with Congress' broad mandate and reflect a rational attempt to establish a framework over a complicated field.

## 2. *Operating Costs of Hospital Laboratories*

The regulations also establish the appropriate reimbursement format for the operating costs, such as technical input, of hospital laboratories. Prior to this regulation, a pathologist could enter an agreement with a hospital under which the pathologist would assume the responsibility for the costs of operating the hospital's laboratory. These costs would then be included in the pathologist's Part B claims. In effect, the hospital could "spin off" the laboratory and thereby could transform costs reimbursable under Part A into costs reimbursable under Part B. The new regulation prohibits such billing practices and provides that Part B payments will be available only for the physician's services. The *hospital* will be paid for any departmental costs borne by the physician, as long as the physician bills the hospital for

these costs. 42 C.F.R. § 405.550(e) (1983). Because we agree with the district court that this regulation is lawful, we affirm.

This regulation represents a reasonable "anti-spin off" provision consistent with the legislative history of the TEFRA amendment and the Secretary's broad mandate to distinguish Part A from Part B services. The Secretary found that the previous billing practice created an opening for double billing and therefore "afforded an opportunity for providers and other parties to make financial arrangements that advantage them at a significant cost to the Medicare program." 48 Fed.Reg. 8912 (1983). The practice thus created an incentive to "maximize reimbursement through spinning off hospital services to lessees and contractors." *Id.* at 8913.

Although Congress did not explicitly direct the Secretary to develop regulations restricting the contracting out of hospital laboratories, it did direct the Secretary to distinguish Part A services from Part B services. In so directing, Congress emphasized the limited extent of Part B payments. *See, e.g.,* 128 Cong.Rec. S10,902 (daily ed. Aug. 19, 1982). Underlying this mandate was a congressional intent to discourage the growth of hospital costs and to compel hospitals to be more efficient. *See, e.g.,* 128 Cong.Rec. H6582 (daily ed. Aug. 19, 1982) (comments of Congressman Dingell); *id.* at H6620 (comments of Congressman St Germain). The Secretary's regulation gives force to this congressional cost containment concern in that it prohibits hospitals from farming out laboratory expenses that properly could be reimbursed under Part A. In other words, the regulation prohibits hospitals and pathologists from transforming recognized Part A costs into Part B costs.

The reasonableness of this regulation can be demonstrated most convincingly by considering the ramifications of its absence. Without this regulation—that is, under the appellants' position—Part B reimbursement would have to include the salary of hospital personnel working in laboratories, the rent, and the cost of equipment and supplies. At the same time, costs of administration would be reimbursable only under Part A. Were we to strike down the regulation, our holding thus would lead to the anomalous result that, while Part B payments could not include the costs of administering a hospital-based laboratory, Part B payments would have to include the costs of operating a hospital-based laboratory. Because it would be a rare lawyer or accountant who could not reclassify the costs of administration into the costs of operation, the congressional objective of cost containment would never be achieved.

Additionally, services rendered in hospital laboratories represent inpatient services and, as such, are generally reimbursable under Part A. *See* 42 U.S.C. §§ 1395b, 1395d(a)(1) (1976). Inpatient hospital services, as set forth in the statute, include:

(2) such nursing services and other related services, such use of hospital facilities, and such medical social services as are ordinarily furnished by the hospital for the care and treatment of inpatients, and such drugs, biologicals, supplies, appliances, and equipment, for use in the hospital, as are *ordinarily furnished by such hospital for the care and treatment of inpatients;* and

(3) *such other diagnostic* or therapeutic *items or services, furnished* by the hospital or by *others under arrangements* with them made by the hospital, as are *ordinarily furnished to inpatients either by such hospital or by others under such arrangements;*

excluding however—

(4) medical or surgical services provided by a physician, resident, or intern;

. . . .

42 U.S.C. § 1395x(b) (1976) (emphasis added). Laboratory services clearly fall within the description "diagnostic services ordinarily furnished to inpatients." The operating costs of a clinical pathologist's laboratory thus are associated with inpatient services and, accordingly, are compensable under Part A, unless an exception applies.

We find no merit in appellant's argument that the operating costs of a hospital laboratory are within the ambit of the "medical

services" exception to the definition of inpatient services. To make this argument, appellants rely on the inclusion of "diagnostic testing" within the statutory definition of "medical and other health services." 42 U.S.C. § 1395x(s) (1976). The Secretary, however, fulfilled whatever obligations that provision might impose through the regulations, discussed *supra*, that allow Part B reimbursement for pathologists who render requested medical services to individual patients. Contrary to appellants' assertions, nothing in the statute requires the Secretary to treat the laboratory's overhead costs as reimbursable under Part B.

Appellants nonetheless seem to suggest that, at a minimum, all overhead costs associated with Part B medical services should be included in Part B reimbursement. At least in this case, we disagree. A hospital-based laboratory can be viewed as a single entity, existing as a source for inpatient services and as a resource for hospital-based physicians. Accordingly, its operating costs can be characterized as part of the hospital's expense in providing inpatient care. Reflecting this "laboratory as a single entity" perspective, the Secretary here reasonably concluded that *all* of the laboratory's overhead costs should be reimbursed under Part A. To allow the opposite result would be to permit pathologists to sift through the operating costs of the laboratory and to identify some portion as reimbursable under Part B. These attempts to divide the largely indivisible costs associated with a hospital laboratory would create an administrative nightmare that could open the door wide for Medicare abuse. We thus decline appellants' invitation to require the Secretary to allow Part B reimbursement for any component of the laboratory's operating costs.

The operating-cost regulation was enacted, at least in part, as a means to foreclose Medicare abuse and to contain the cost of that program. As such, the regulation is reasonable and consistent with the statute and with congressional intent.

### 3. *Prohibition on Direct Billing*

The regulations also provide, albeit in not the clearest language, that if a service may

be reimbursed under Part A, neither the hospital nor the physician may seek compensation from the patient under Part B or outside the Medicare program. 42 C.F.R. § 405.550(d) (1983). Appellants argue that this regulation is an abuse of the Secretary's statutory authority and constitutes an unlawful interference with medicine. We disagree.

■ The Secretary's authority, however broad, is not boundless. Congress explicitly prohibits federal actions that interfere with the practice of medicine:

Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

42 U.S.C. § 1395 (1976). As we previously have noted, the sections of the Medicare Act "must be read together 'to produce a symmetrical whole.'" *Home Health Care, Inc. v. Heckler*, 717 F.2d 587, 590 (D.C.Cir. 1983) (quoting *Federal Power Commission v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949)).

Appellants argue that the regulation violates the non-interference provision insofar as it interferes with the financial relationship between a physician and his or her patient. To establish that this constitutes unlawful interference, appellants rely heavily on pieces from the Medicare Act's legislative history that arguably reveal that the physician/patient financial relationship is sacrosanct. Be that as it may, those pieces of legislative history are inapposite.

■ The Medicare Act specifically sanctions some "interference" with the hospital-patient relationship in that it explicitly prohibits hospitals from billing a patient for "services for which such individual is entitled to have payment made" under the Medicare Act. 42 U.S.C. § 1395cc(a)(1)(A)

(1976). We see no analytical difference between the restrictions imposed by the statute on the hospital and the restrictions imposed by the regulation on the hospital-based physician. The regulation only provides that when the hospital-based physician can be reimbursed on the basis of reasonable cost, he or she cannot seek compensation outside the Medicare program. Services reimbursable under reasonable cost involve administrative services or services that do not ordinarily require a physician to perform. Accordingly, the non-billing regulation only affects the pathologist when he or she is acting, in essence, as a hospital employee or as the hospital's alter ego. The "affected" financial relationship thus is that between hospital and patient, and *not* that between doctor and patient. The regulation therefore merely traces the statutory limitation already imposed on hospitals and a decision to invalidate the regulation thus would be close to a decision to invalidate the statute. Such a result would, in essence, elevate the noninterference section above the hospital-billing section. This certainly would not "produce [the] symmetrical whole" that is our guidepost in applying the noninterference provision. Accordingly, we decline to invalidate the regulation as an unlawful interference with the practice of medicine.

## C. *Regulatory Drafting*

Many of the challenges urged by appellants stem from the quality of drafting reflected in the Secretary's regulations. The Secretary has a duty to draft concise, articulate regulations. This is especially true in an area as sensitive and complex as Medicare. Unfortunately, the regulations pertinent to this case are hardly a model for excellence.

Two examples highlight our point. In the explanatory comments, the Secretary notes that she "expect[s] that claims for Part B reasonable charge payment for consultations will be limited to those occasions that clearly require the exercise of *serious* medical judgment by a pathologist ...." 48 Fed.Reg. 8933 (1983) (emphasis added). We are at a loss as to the meaning of the term "serious" in this context, and reject it as irrelevant to any of the issues in this case—a clear example of over-explanation to the point of confusion. If we thought that the Secretary in fact was drawing a distinction between "serious" and "non-serious" medical judgments, whatever this distinction might involve, this case would be much, much closer. Our second illustration comes from a letter dated January 13, 1984, in which the Deputy Director, Bureau of Eligibility, Reimbursement and Coverage, notes that "consultations payable under Part B on a reasonable charge basis should not be frequent occurrences." This statement is wholly inappropriate since the frequency of Part B payments must be measured by the established criteria, rather than any precatory admonition to hold down the number of requests for payment. Taken together these statements could be read to suggest that the criteria are merely a facade—that the Secretary's real objective is to *always* deny Part B coverage. The "explanations" tending to such a conclusion are glaring examples of how not to form and buttress agency regulations.

We do not think, however, that the level of redundancy rises to a level requiring reversal. We nonetheless admonish the agency to use more care in drafting and explaining its regulations. A broad mandate from Congress is no excuse whatsoever for imprecise, unnecessarily broad language.

## III. CONCLUSION

We have considered the other arguments raised by appellants or intervenors and find them without merit. We therefore affirm the district court's grant of summary judgment in favor of the Secretary. The regulations comport with Congress' broad mandate, do not exceed the Secretary's statutory authority, and do not constitute an unlawful interference with the practice of medicine.

*Affirmed.*