**NATIONAL ASSOCIATION OF PATIENTS ON HEMODIALYSIS AND TRANSPLANTATION, INC., et al., Plaintiffs,**

v.

**Margaret M. HECKLER, et al., Defendants.**

**Civ. A. No. 83–2210.**

United States District Court, District of Columbia.

June 11, 1984.

---

Joseph N. Onek, Peter E. Scheer, Paul M. Smith, Onek, Klein & Farr, Thomas W. Queen, Wiley, Johnson & Rein, Washington, D.C., Robert J. Pristave, Chicago, Ill., James L. Quarles, III, Hale & Dorr, Washington, D.C., for plaintiffs.

Theodore C. Hirt, Civ. Div., U.S. Department of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

In this action for declaratory and injunctive relief, plaintiffs, the National Associa-

tion of Patients on Hemodialysis and Transplantation, Inc., a national non-profit organization of kidney dialysis and transplant patients; the Renal Physicians Association, a national non-profit organization of physicians specializing in the treatment of kidney disorders and whose members treat dialysis patients receiving Medicare benefits under the End-Stage Renal Disease program; and, Bio-Medical Applications of Vero Beach, Inc., an independent dialysis facility which provides outpatient services in Vero Beach, Florida, under the End-Stage Renal Disease program; challenge regulations promulgated by defendants, Margaret M. Heckler, Secretary of the Department of Health and Human Services (HHS), and Carolyne K. Davis, Administrator of the Health Care Financing Administration (HCFA).

In Count I of the complaint, plaintiffs seek to prevent implementation of the End-Stage Renal Disease program's "Prospective Reimbursement" regulations, 48 Fed. Reg. 21254 *et seq.* (May 11, 1983). In Count II plaintiffs seek to prevent implementation of the End-Stage Renal Disease program's "Secondary Payment" regulations, 48 Fed.Reg. 14802 *et seq.* (April 5, 1983). The matter is now before the Court on the parties' cross-motions for summary judgment as to each of the counts of the complaint.[1]

## I. BACKGROUND

### A. *End-Stage Renal Disease*[2]

End-stage renal disease, also called chronic renal failure or chronic uremia, is the permanent and irreversible breakdown of the capacity of the kidneys to carry on their function of the disposal of toxic wastes. Approximately 70,000 Americans suffer from this disease, which is fatal unless the patient receives a kidney transplant or commences regular dialysis.

The two basic types of dialysis treatment are hemodialysis and peritoneal dialysis. Hemodialysis is a treatment process in which the patient's blood is circulated through an artificial kidney machine that filters out toxic wastes before returning the blood to the body. Standard treatment requires the patient to be dialyzed for about four hours, three times a week. Peritoneal dialysis is a treatment process in which the patient's blood is filtered through the peritoneal membrane in the patient's abdominal cavity. Hemodialysis is the more common of the two methods; peritoneal dialysis is marked by a higher rate of infection, complications and resulting hospitalization.

Most patients begin dialysis on an inpatient basis while hospitalized for acute kidney failure. Once the patient's condition stabilizes, he or she may be treated as an outpatient. Outpatient dialysis may take place either at a hospital-based or independent outpatient dialysis facility, or at home. Approximately 83 percent of all dialysis patients receive maintenance dialysis in a facility. Of that 83 percent, 47 percent of in-facility dialysis takes place in hospitals and 53 percent in independent facilities which serve renal patients exclusively. The remaining 17 percent of all dialysis patients dialyze at home. Home dialysis is generally agreed to be substantially less expensive than in-facility dialysis.

### B. *Statutory and Regulatory Scheme*

In 1965, Congress established the Medicare Program, Title XVII of the Social Se-

1. Plaintiffs originally filed a motion for a preliminary injunction with respect to the prospective reimbursement regulations, and a motion for partial summary judgment, or in the alternative, for a preliminary injunction, with respect to the secondary payment regulations. Defendants filed a cross-motion for partial summary judgment with respect to the secondary payment regulations. At a hearing on all pending motions, the Court elected, with the consent of the parties, to treat plaintiffs' preliminary injunction motion and defendants' opposition

thereto as to Count I of the complaint, as cross-motions for summary judgment. Plaintiffs and defendants have since filed supplemental memoranda.

2. This discussion is derived largely from plaintiffs' memorandum of points and authorities in support of their motion for a preliminary injunction at 3–6 and *the accompanying affidavits*.

curity Act (Act), 42 U.S.C. §§ 1395–1395pp (1976), to provide funds for medical care for the aged and disabled. The program consists of two parts. Part A, 42 U.S.C. §§ 1395c–1395i, the hospital insurance program, pays for inpatient hospital services and related post-hospital services. Institutional "providers of services"[3] under Part A have generally been reimbursed on the basis of "reasonable cost." 42 U.S.C. §§ 1395f(b), 1395x(v)(1). Part A covers all individuals eligible for monthly Social Security benefits and is funded by Social Security taxes. 42 U.S.C. §§ 1395c, 1395i. Part B, 42 U.S.C. §§ 1395j–1395w, is a voluntary supplemental insurance program in which beneficiaries enroll to establish entitlement to benefits. Part B generally pays for "reasonable charges" of physicians' services and other health services, such as x-rays and laboratory tests, subject to deductible and coinsurance requirements. 42 U.S.C. §§ 1395k, 1395*l*, 1395x(s).[4] Part B is funded by monthly premiums paid by beneficiaries and matching federal contributions. 42 U.S.C. §§ 1395j, 1395r, 1395s. Part B benefits are administered by insurance carriers pursuant to contracts with HHS. 42 U.S.C. § 1395u. The carriers set reasonable charges for Part B services. Under the coinsurance feature, Medicare pays 80 percent of reasonable charges for covered services and the beneficiary pays the remaining 20 percent. 42 U.S.C. § 1395*l*(a)(1).

The End-Stage Renal Disease (ESRD) program was established by Section 299I of the Social Security Amendments of 1972, 42 U.S.C. §§ 426(f), (g). That law extended Medicare coverage to individuals who suffer from permanent kidney failure, require dialysis or kidney transplantation, and meet certain other eligibility requirements. HHS established special reimbursement rules for the ESRD program within the general Medicare framework of reasonable cost reimbursement for providers and reasonable charge reimbursement for physicians and suppliers. 42 C.F.R. §§ 402(g), 405.502(e), 405.541–405.544. Under these rules, which were in effect until August 1, 1983, hospital dialysis facilities were paid 80 percent of the "reasonable cost" of providing dialysis treatment up to 80 percent of $138, the maximum amount available per treatment. Independent dialysis facilities were reimbursed 80 percent of the "reasonable charge" up to a maximum 80 percent of $138 per treatment.[5] This system provided an economic incentive to independent facilities to minimize the costs of dialysis treatment. *See Proposed Regulations Governing Reimbursement Under the End-Stage Renal Disease Program,* Hearings before the Subcommittee on Oversight of the Committee on Ways and Means, House of Representatives, 97th Cong., 2d Sess. at 180–81 15, (Apr. 22, 1982) (Statement of Carolyne K. Davis). However, dialysis facilities could request reimbursement in excess of the maximum amount if they submitted documentation showing that their actual costs exceeded $138 per treatment.[6]

---

3. The term "provider of services" includes a hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, hospice program or home health agency. 42 U.S.C. § 1395x(u).

4. The Medicare Program refers to these various health services as "suppliers of services," unless furnished by a physician or a provider of services. Part B services furnished by a provider have been reimbursed on the basis of "reasonable cost." 42 U.S.C. § 1395*l*(a)(2).

5. An additional $12 per outpatient dialysis treatment was added if physicians at the facility received payment from the facility, rather than directly from Medicare, for clinical services rendered to patients.

6. Reimbursement for home dialysis under the prior rules was paid in three different ways:

 1. Reimbursement on a retrospective allowable cost basis at 80 percent of reasonable costs. 42 C.F.R. § 405.690;

 2. Reimbursement on a prospective rate basis under a "Target Rate Reimbursement Agreement" with HCFA at 80 percent of the facility's approved target rate. 42 C.F.R. § 405.691;

 3. Reimbursement to the patient who has dealt directly with vendors of dialysis equipment and supplies, or to the dialysis equipment vendor to whom the patient has assigned his or her right to reimbursement, at 80 percent.

Equipment costs were separately reimbursable at 100 percent under all three reimbursement methods if a facility or a state program had such an agreement with HCFA.

Beginning in 1973, the regulations provided for reimbursement to physicians for their services to dialysis patients, under the "Initial Method." Medicare reimbursed the facility for physicians' services to patients who dialyzed in the facility. The facility then paid the physician a privately negotiated fee. In 1974, a second payment method, the "Alternative Reimbursement Method," was established. Physicians could choose to be reimbursed directly by Medicare with a single monthly payment intended to cover all routine outpatient clinical services rendered to a dialysis patient during the month. 42 U.S.C. § 1395rr(b)(3); 42 C.F.R. § 405.542. The monthly payment was derived by multiplying the customary and prevailing local charge for a follow-up visit by a "conversion factor" selected to provide reimbursement for all standard physicians' services.

In response to the rising costs of the ESRD program, Congress enacted the End-Stage Renal Disease Program Amendments of 1978, Pub.L. No. 95–292, 42 U.S.C. § 1395rr(b)(2)(B). This legislation directed the Secretary to develop new methods and procedures to determine the costs incurred by dialysis facilities and to determine "on a cost related or other economical and equitable basis" the amount of payments to be made for services fur-

nished by dialysis facilities. Congress also directed the Secretary to develop a system for classifying comparable providers and facilities and for the setting of prospective reimbursement rates. These amendments specifically authorized the Alternative Method of physician reimbursement and added a number of other provisions designed to encourage less expensive home dialysis treatments, and transplantation. *See* S.Rep. No. 714, 95th Cong., 2d Sess. 1–5 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 848–852.

In the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 42 U.S.C. § 1395rr(b)(3)(7), Congress again amended the law to direct the Secretary to develop a method of prospective reimbursement that would encourage the use of home dialysis. Specifically, Congress provided that such a system must either reimburse home dialysis and in-facility dialysis under composite rates that combined payment for home and in-facility dialysis, or use some other method that would be determined to be more efficient and would promote home dialysis more effectively.[7] Congress assumed that under such a composite rate system facilities would have a greater economic incentive to treat patients at home. The provisions governing reimbursement for physicians' services were also amended to pro-

7. This amendment, codified at 42 U.S.C. § 1395rr, provides in pertinent part:

"(b) The Secretary shall prescribe in regulations any methods and procedures to (i) determine the costs incurred by providers of services and renal dialysis facilities in furnishing covered services to individuals determined to have end-stage renal disease, and (ii) determine, on a cost-related basis or other economical and equitable basis (including any basis authorized under section 1395x(v) of this title) and consistent with any regulations promulgated under paragraph (7), the amounts of payments to be made for part B services furnished by such providers and facilities to such individuals.

. . . .

(7) The Secretary shall provide by regulation for a method (or methods) for determining prospectively the amounts of payments to be made for dialysis services furnished by providers of services and renal dialysis facilities to individuals in a facility and to such individuals at home. Such method (or methods) shall provide for the prospective determination of a rate (or rates)

for each mode of care based on a single composite weighted formula (which takes into account the mix of patients who receive dialysis services at a facility or at home and the relative costs of providing such services in such settings) for hospital-based facilities and such a single composite weighted formula for other renal dialysis facilities, or based on such other method or combination of methods which differentiate between hospital-based facilities and other renal dialysis facilities and which the Secretary determines, after detailed analysis, will more effectively encourage the more efficient delivery of dialysis services and will provide greater incentives for increased use of home dialysis than through the single composite weighted formulas. The Secretary shall provide for such exceptions to such methods as may be warranted by unusual circumstances (including the special circumstances of sole facilities located in isolated, rural areas). The Secretary may provide that such method will serve in lieu of any target reimbursement rate that would otherwise be established under paragraph (6)."

mote efficient delivery of dialysis services and to provide incentives for the increased use of home dialysis. 42 U.S.C. § 1395rr(b)(3).

Another section of the Omnibus Budget Reconciliation Act of 1981 amended portions of the Social Security Act to provide that Medicare benefits based solely on the ESRD program are secondary to benefits payable under employer group health plans. The law provides that the Secretary may not pay benefits on behalf of ESRD beneficiaries who are covered under employer group health plans, if payment under such a plan has been made or "the Secretary determines will be made ... as promptly as would otherwise be the case if payment were made by the Secretary under this title." 42 U.S.C. § 1395y(b)(2)(A).

### C. *The Challenged Regulations*

1. Reimbursement of Facilities and Physicians (Reimbursement Regulations)

On May 11, 1983, defendants issued new regulations for reimbursement of facilities and physicians under the ESRD program. 48 Fed.Reg. 21254 *et seq.* (May 11, 1983), amending 42 C.F.R. Part 405. The regulations, effective August 1, 1983, establish prospective reimbursement rates for dialysis services whether furnished at home or in a hospital-based or independent dialysis facility. They also establish a monthly capitation method of payment for physicians' services to ESRD patients, under which each participating physician will receive a flat monthly payment, based upon a presumed 12.4 dialysis sessions per patient per month and a monthly examination.

HCFA determined that the rational median cost of all in-facility dialysis, including independent facilities and hospital-based facilities, was $125, and that the national median cost of home dialysis for all patients was $97. HCFA used these cost figures to develop composite reimbursement rates. Under the new system, each facility will receive the same payment for in-facility dialysis and for home dialysis performed by patients under its direction. The level of reimbursement, $127 per treat-ment for independent facilities and $131 for hospital-based facilities, is deliberately set below the prior rate of $138 per session, but because the facility receives more than the actual cost of home dialysis for each treatment, it should be adequately compensated. This cross-subsidy is intended to promote efficiency in the provision of services and increased use of home dialysis. 48 Fed.Reg. at 21260–21268.

The new regulations also limit the circumstances under which facilities may obtain "exceptions" to the composite rates, and abolish the target rate reimbursement system and the program under which equipment costs were reimbursable at 100 percent.

With respect to reimbursement for physicians' services, the new regulations eliminate the Initial Method. In addition, they change the level of reimbursement under the remaining Alternative Method by applying a single base multiplier to physicians' services rendered to in-facility patients and for services rendered to home patients, instead of the previously used "conversion factors".

Plaintiffs contend that the reimbursement regulations and payment methodology are based on incorrect data concerning the costs of dialysis services and incorrect assumptions concerning the capacity of dialysis facilities to alter their costs for dialysis services. They contend, further, that the new system for reimbursing physicians is inconsistent with Congressional intent and founded upon incorrect assumptions concerning the nature of physicians' services provided to dialysis patients. These defects allegedly render the new reimbursement regulations "arbitrary and capricious" under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and not in accordance with the Congressional directive to defendants to promulgate regulations producing efficient, economical and equitable delivery of dialysis services.

2. Secondary Payment Regulations

On April 5, 1983, the Secretary promulgated final regulations implementing 42

U.S.C. § 1395y(b)(2)(A). 48 Fed.Reg. 14802, 14811 (Apr. 5, 1983), amending 42 C.F.R. Part 405, Subpart C. These regulations make employer group health plans the primary payer of benefits for a patient's initial 12 months of eligibility for ESRD program benefits. An intermediary or carrier is to pay conditional primary benefits only if it "knows from experience or ascertains that the employer plan's payments are substantially less prompt than Medicare's." 48 Fed.Reg. at 14812.

Plaintiffs allege that Section 2146 of the Omnibus Budget Reconciliation Act of 1981 requires that conditional primary payments be made except when there has been payment by an employer group health plan or a prior determination by the Secretary that payment under an employer group health plan will be as prompt as if payment were made by the Secretary under Medicare. The Secondary Payer Regulations do not provide for such determinations by the Secretary, and thus, plaintiffs maintain, contravene the statute and, violate the APA.

## II. JURISDICTION

■ Defendants maintain that this Court lacks jurisdiction over plaintiffs' claims, which arise under Part B of the Medicare Act, for two separate reasons. First, they argue that jurisdiction is squarely precluded by *United States v. Erika,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). Second, they argue that jurisdiction is additionally precluded by the Social Security Act, 42 U.S.C. § 405(h) as incorporated into the Medicare Act by 42 U.S.C. § 1395ii.

*Erika*[8] held that both the language and legislative history of 42 U.S.C. § 1395ff[9] evince a clear Congressional intent to foreclose judicial review of adverse determinations of benefit amounts made by private insurance carriers under Part B. 456 U.S. at 208–09, 102 S.Ct. at 1654–55.

Part B carrier determinations are subject to review by a hearing officer designated by the carrier where the amount in controversy is $100 or more. 42 U.S.C. § 1395u(b)(3)(C). The hearing officer's decision is final and binding on all parties. 42 C.F.R. § 405.835. Congress explicitly provided for review by the Secretary of whether an individual is entitled to benefits under Part A or Part B and of the determination of the amount of benefits under Part A. 42 U.S.C. § 1395ff(a). Judicial review of the Secretary's decision is available only where the dispute relates to eligibility to participate in either Part A or Part B, or when the dispute concerns the amount of benefits to which they are entitled under Part A. 42 U.S.C. § 1395ff(b). Thought to be generally smaller than those under Part A, Part B amount determinations were made unreviewable "in order to avoid overloading the courts with quite minor matters." 118 Cong.Rec. 33992 (1972) (statement of Senator Bennett).

---

**8.** In *Erika,* a distributor of kidney dialysis supplies disputed a private insurance carrier's determination of "reasonable charges" under the reimbursement provisions of the Act.

**9.** That section provides in part:
"1395ff. Determinations of Secretary
 (a) Entitlement to and amount of benefits
 The determination of whether an individual is entitled to benefits under part A or part B of this subchapter, and the determination of the amount of benefits under part A of this subchapter, shall be made by the Secretary in accordance with regulations prescribed by him.
 (b) Appeal by individuals
 (1) Any individual dissatisfied with any determination under subsection (a) of this section as to—
 (A) whether he meets the conditions of section 426 or section 426a of this title, or

 (B) whether he is eligible to enroll and has enrolled pursuant to the provisions of part B of this subchapter, or section 1395i–2 of this title, or section 1819, or
 (C) the amount of benefits under part A of this subchapter (including a determination where such amount is determined to be zero) shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.
 (2) Notwithstanding the provisions of subparagraph (C) of paragraph (1) of this subsection, a hearing shall not be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $100; nor shall judicial review be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $1,000."

Minimizing the significance of *Erika's* narrow focus on benefit amount determinations by private carriers, defendants maintain that plaintiffs' substantive challenges to the May 11, 1983 reimbursement regulations and the April 5, 1983 secondary payment regulations essentially represent efforts to obtain higher levels of reimbursement for Part B claims. Thus, they argue that section 1395ff, as interpreted by *Erika*, mandates dismissal of plaintiffs' complaint.

However, plaintiffs' claims involve the Secretary's administration of the Part B program rather than the validity of any particular benefit determinations, defendants' characterization notwithstanding. Indeed, defendants' argument has been expressly rejected recently by the United States Court of Appeals for this Circuit in *College of American Pathologists v. Heckler*, 734 F.2d 859 (D.C.Cir.1984); by the Sixth Circuit in *Michigan Academy of Family Physicians v. Blue Cross and Blue Shield of Michigan*, 728 F.2d 326 (6th Cir.1984); and by the Fourth Circuit in *Starnes v. Schweiker*, 715 F.2d 134 (4th Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 2673, 81 L.Ed.2d 870 (1984). In *College of American Pathologists*, plaintiffs challenged HHS regulations that established qualifications for Medicare reimbursement for services rendered by clinical pathologists in hospital laboratories. The Court upheld the jurisdiction of the District Court, finding no legislative intent to preclude judicial review "of a challenge to the broad regulatory framework adopted by the Secretary. The legislative history cited in *Erika* only reveals an intent to preclude review of Part B *amount* determinations." *Id.* 734 F.2d at 863 (emphasis in original).

In *Michigan Academy*, plaintiffs challenged HHS' classification for reimbursement purposes of certain family physicians separately from other physicians with comparable qualifications. Although defendants had alleged that the suit involved simply a reimbursement dispute, the Court determined that plaintiffs were "challenging the overall mechanism for determining the amounts of reimbursements, not the actual value of any particular reimbursement ... Section 1395ff, by its terms as interpreted by the Supreme Court [in *Erika*], precludes judicial review of decisions by the carrier concerning amounts of reimbursements, but is silent on the question of reviewing decisions of the Secretary made in implementing the overall Medicare part B program." 728 F.2d at 330. The Court refused to construe that silence as an affirmative restriction on judicial review. *Id.* at 330–331.

And, in *Starnes*, plaintiffs brought procedural, substantive and constitutional challenges to the establishment and implementation by the Secretary of nationwide regional ceilings or caps on Part B reimbursements for computerized tomography head scans. The Court held that the language of section 1395ff indicates that Congress sought to preserve judicial review of actions performed by the Secretary, as distinguished from actions delegated to private carriers under the Medicare Act. 715 F.2d at 138. *See also Colonial Penn Ins. Co. v. Heckler*, 721 F.2d 431 (3rd Cir.1983) (permitting review to challenge regulations implementing legislation making Medicare benefits secondary to insurance coverage).

In the instant case, while the eventual result of litigation could be an increase in amounts of reimbursement, plaintiffs seek to enforce lawful conduct on the part of the Secretary in her administration of the ESRD program, and not to overturn any adverse determination of a particular claim for reimbursement. Preclusion of jurisdiction over this considerable case would not further the legislative policy cited in *Erika* of relieving the courts from the burden imposed by relatively insignificant lawsuits. Rather, Congress could not have intended to imbue the Secretary with "unbridled discretion to promulgate any regulation [s]he chose." *Michigan Academy v. Blue Cross*, 728 F.2d at 331. The complete absence of judicial oversight over an entire regulatory program would raise a serious constitutional issue concerning an improper

delegation of legislative power to the Executive.[10]

Defendants cite *Schweiker v. McClure,* 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982), decided the same day as *Erika,* which upheld the carrier administrative appeals mechanism against constitutional attack, for the proposition that the absence of judicial review does not render the Medicare statute constitutionally infirm. However, the action by the Court in *Schweiker v. McClure,* is evidence of the reviewability of the constitutional challenge to the benefit determination procedures at issue in that case. *See Michigan Academy v. Blue Cross,* 728 F.2d at 330; *Starnes v. Schweiker,* 715 F.2d at 138. *See also Ratoike v. Heckler,* No. 81 C 697, slip. op. (N.D.Ill. Mar. 21, 1984).

■ Defendants' second argument is similarly flawed. They contend that even if the language of section 1395ff, as construed by *Erika,* does not deprive the Court of jurisdiction over this case, 42 U.S.C. § 405(h), Title II of the Social Security Act, incorporated into the Medicare Act by 42 U.S.C. § 1395ii, clearly proscribes jurisdiction over all Part B claims because review of those claims is not specifically available under section 1395ff. Section 405(h) states:

> The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

By its own terms, section 405(h) is inapplicable to this case, which involves no findings of fact nor any decision by the Secretary on a claim for benefits. *See Colonial Penn Ins. Co. v. Heckler,* 721 F.2d at 439; *Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976) ("Absent such a claim there can be no 'decision' of any type. And some decision is clearly required by the statute"). Indeed, it is precisely because the statute contemplates no administrative hearing in this context, that plaintiffs have brought this law suit.[11]

Several courts have disregarded section 405(h) where no other form of review is available for the plaintiff's claims. *College of American Pathologists v. Heckler,* 734 F.2d at 862; *National Association of Home Health Agencies v. Schweiker,* 690 F.2d 932, 940 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983) (*NAHHA*); *Michigan Academy v. Blue Cross,* 728 F.2d at 330–331; *Starnes v. Schweiker,* 715 F.2d at 140; *United States v. Aquavella,* 615 F.2d 12, 20–21 (2d Cir.1979); *Whitecliff, Inc. v. United States,* 536 F.2d 347, 351 (Ct.Cl. 1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1972). *Cf. Colonial Penn Ins. Co. v. Heckler,* 721 F.2d at 436–437, 439 (absence of administrative mechanism for plaintiff's constitutional challenge to Medicare regulations designed to make

---

**10.** *See Amalgamated Meat Cutters v. Connally,* 337 F.Supp. 737, 759 (D.D.C.1971). "The claim of undue delegation of legislative power broadly raises the challenge of undue power in the Executive and thus naturally involves the considerations of the interrelated questions of the availability of appropriate restraints through provisions for administrative procedure and judicial review." *See also Yakus v. United States,* 321 U.S. 414, 423–426, 64 S.Ct. 660, 666–68, 88 L.Ed. 834 (1944); Note, *Rethinking the Nondelegation Doctrine,* 62 B.U.L.Rev. 257, 295–96 (1982).

**11.** The regulations challenged in the instant case explicitly deny review of claims such as plain-tiffs' by the Provider Reimbursement Review Board (PRRB). 48 Fed.Reg. at 21257–21258. The PRRB has jurisdiction over appeals of provider reimbursement claims under Part A if certain jurisdictional requirements are met. Final decisions of the PRRB may be appealed further to federal district court. 42 U.S.C. § 1395oo(f)(1). Under Part B, a "fair hearing by the carrier" is available for reimbursement disputes involving $100 or more. 42 U.S.C. § 1395u(b)(3)(C). The Medicare Act does not grant any right to have the carrier's reimbursement determination reviewed by the Secretary or a Court. *See supra,* at 1115.

Medicare payment liability secondary to automobile insurance coverage, "critical" in exercising federal question jurisdiction despite section 405(h)); *St. Louis Univ. v. Blue Cross Hosp. Service,* 537 F.2d 283, 292 (8th Cir.), *cert. denied sub nom., Faith Hosp. Ass'n v. Blue Cross Hosp. Service, Inc.,* 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976) (section 405(h) does not preclude Court's consideration of constitutional issues where no adequate alternative means of judicial review).

In addition, several courts, including the Court of Appeals for this Circuit in *NA-HHA,* have concluded that section 405(h) is not a bar to federal question jurisdiction for challenges to the "mode of reimbursement" as opposed to challenges "directly related to a claim for reimbursement." *NAHHA,* 690 F.2d at 938; *Colonial Penn Ins. Co. v. Heckler,* 721 F.2d at 438; *Starnes v. Schweiker,* 715 F.2d at 139–141. *But see American Association of Councils of Medical Staffs of Private Hospitals, Inc. v. Califano,* 575 F.2d 1367, 1372 (5th Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1018, 59 L.Ed.2d 72 (1979).

Plaintiffs' inability to present their claims before any administrative tribunal further establishes that their claims do not directly concern the amount of reimbursement they may eventually receive. In *College of American Pathologists,* the District Court rejected the argument that section 405(h) had barred jurisdiction in previous cases merely because plaintiffs sought reimbursement. Rather "the fact that plaintiffs sought reimbursement meant that they had an alternative avenue of judicial review available to them under 42 U.S.C. § 1395oo." *College of American Pathologists v. Heckler,* No. 83–1081, slip op. at 12 (D.D.C. May 26, 1983). *E.g., Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070, 1079 (D.C.Cir.1978); *Association of American Medical Colleges v. Califano,* 569 F.2d 101, 110 (D.C.Cir.1977). Defendants have failed to suggest a possible forum for plaintiffs' claims. Plaintiffs seek to redress alleged statutory violations, whether or not motivated by the potentiality of increased reimbursement amounts.

There being no alternative form of review, the Court readily asserts jurisdiction over this case.

## III. MERITS

### A. *Standard of Review*

Under the APA, the Court "shall hold unlawful and set aside agency action, findings and conclusion found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Supreme Court recently articulated in *Motor Vehicle Manufacturers Assoc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983):

> [t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."

*Id.* at 2866–67 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). The Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). An agency's action will normally be found arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Assoc.*, 103 S.Ct. at 2867. *See also International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 814 (D.C.Cir.1983).

■ Many administrative decisions regarding Medicare policy are appropriately committed to HHS' expertise. *E.g., Sun Towers, Inc. v. Schweiker*, 694 F.2d 1036, 1038 (5th Cir.1983), *citing Psychiatric Institute of Washington, D.C., Inc. v. Schweiker*, 669 F.2d 812, 813–14 (D.C.Cir. 1981). The Court must sustain the agency's interpretation of the Medicare Act, if, after a "searching and careful" inquiry of the rulemaking record, it concludes that the interpretation is reasonable. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 416, 91 S.Ct. at 823–24; *see National Association of Metal Finishers v. EPA*, 719 F.2d 624, 636–637 (3d Cir.1983); *cert. granted sub nom., Chemical Manufacturers Assoc. v. National Resources Defense Council, Inc.*, —— U.S. ——, 104 S.Ct. 2167, 80 L.Ed.2d 551 (1984); *Tabor v. Joint Board for Enrollment of Actuaries*, 566 F.2d 705, 710 (D.C.Cir.1977).

## B. *Reimbursement Regulations*

As previously stated, these regulations, issued May 11, 1983 and effective August 1, 1983, establish prospective composite reimbursement rates for dialysis services, including physicians' services. The rates are designed to promote home dialysis. Plaintiffs do not dispute defendants' decision to adopt a composite rate system of reimbursement, nor defendants' authority to create a cross-subsidy between home and in-facility dialysis services. Rather, they contend that in establishing such a system, defendants were required "to take into account the enormous economic pressure that is brought to bear on efficient facilities that (1) have fewer than the national percentage of home dialysis patients, and (2) are unable over the short term to achieve these national percentages." Plaintiffs'

Supplemental Memorandum in Support of Their Motion for Summary Judgment at 2–3. These facilities, already operating at maximum efficiency,[12] allegedly can continue to operate under the new regulations only by reducing costs in a manner that diminishes the quality of care provided to the dialysis patient.

Plaintiffs' challenge is essentially four-pronged: they allege (1) that the rate setting methodology does not account for barriers to increased home dialysis; (2) that the composite rates are based on inadequate cost information; (3) that the exceptions process erroneously excludes a return on equity; (4) and, that the system of reimbursement for physicians is irrationally based and contrary to Congressional intent. In addition, plaintiffs contend that the regulations should provide for a phase-in period.

### 1. Barriers to Increased Home Dialysis

■ Plaintiffs maintain that in creating a cross-subsidy between in-facility dialysis and home dialysis, defendants have presupposed that efficiently operated dialysis facilities will be able to commit a substantial portion of their resources to home dialysis. They argue, however, that defendants have failed to consider various factors, totally beyond the facilities' control, which call into question defendants' premise. These factors are: (1) established patterns of patient referral which favor hospital-based dialysis facilities, and which will create unevenness in the relative abilities of independent facilities to attract home patients; (2) that many state agencies require a "Certificate of Need" before a dialysis facility may initiate a home dialysis training program; (3) the socio-economic characteristics of poor, elderly and other patients for whom home dialysis is not a realistic alternative; and, (4) resistance to home dialysis by patients who have become accustomed to in-facility care (which indicates the need for

---

**12.** Plaintiffs point out that under the old regulations independent dialysis facilities already had an economic incentive to minimize costs because they were permitted to retain the difference between the amount of reimbursement

and the actual cost of services. Congress has apparently determined, however, that this incentive was insufficient to promote home dialysis.

some phase-in period). In addition, plaintiffs argue that HHS has failed to consider two related factors: the continued ability of home patients to bill for their supplies and equipment other than through facilities, and the alleged propensity of facilities to "bid up" the costs of home dialysis in competing for home patients. Plaintiffs suggest some methods by which HHS could have adjusted the composite rates to compensate for these barriers to home dialysis. They maintain that defendants' failure to make such adjustments renders the reimbursement regulations arbitrary and capricious.

Defendants emphasize that Congress was aware of the factors plaintiffs now raise when it instructed HHS to adopt a single reimbursement rate structure for in-facility and home dialysis, based on the cost experience of more efficient facilities. Moreover, Congress assumed that the proportion of home patients can be and should be increased over time and that the reimbursement system should be structured to promote that increase. Defendants maintain that the reimbursement regulations rationally implement the statute, and that plaintiffs' challenge is in reality to the statute itself.

Specifically, with respect to each of the alleged barriers to increased home dialysis, defendants respond that: (1) many independent facilities are actually reimbursed above the median costs per treatment and, therefore, plaintiffs' argument concerning the limited availability of referral of home patients to offset presumed losses must fail; (2) HHS did consider state Certificate of Need requirements for home training programs and concluded that unapproved facilities may arrange to have home patients trained by another approved facility, 48 Fed.Reg. at 21267; since those requirements approved are state-imposed, HHS has no authority to abolish them; and (3) HHS did consider the argument that many patients may be unsuited for home dialysis for socio-economic or other reasons and concluded that although 30–40 percent of the patient population can dialyze at home only 17 percent now do so; the ultimate

responsibility for deciding whether a patient is an appropriate candidate for home dialysis rests with the physician and the patient. The majority of patients will continue to dialyze in a facility. In response to plaintiffs' other arguments, defendants state that HHS was aware of, and considered the effect of the system on the home patients' right to continue to deal directly with suppliers. 48 Fed.Reg. at 21266. Defendants believe, based upon a survey of home patients, that 85 percent have elected to come under the composite rate. Declaration of Bernadette S. Schumaker, Oct. 13, 1983 at ¶ 18. They also doubt that costs of home dialysis will increase because of the composite system.

The rulemaking record reflects that, in developing the reimbursement regulations, HHS considered plaintiffs' concerns, among other relevant factors, and was sensitive to the needs of patients and providers, while mindful of the serious financial problems confronting the ESRD program. In short, HHS has sought to implement Congress' desire for increased efficiencies and strong incentives for home dialysis by setting the composite rate between the in-facility costs per treatment of some facilities. Plaintiffs agree that it is proper to reimburse facilities at rates below their current reported costs to provide those incentives. Plaintiffs simultaneously limit their concern to facilities with percentages of home patients below the national average. The Court is persuaded by defendants' argument that to adjust the composite rate to accommodate those facilities would run counter to the Congressional purpose: to increase incentives for home dialysis at the very facilities where the percentage of home patients has been low. *See* H.R.Rep. No. 158, V, 97th Cong., 1st Sess. 321–325 (1981); H.R.Rep. 208, 97th Cong., 1st Sess. 948 (1981) (Conference Report), *reprinted in* [1981] U.S.Code Cong. & Ad.News 396, 1310. While individualized adjustments to the composite rate, or a separate exception for facilities which are able to demonstrate an inability to break even under the composite rate without sac-

rificing patient care,[13] as plaintiffs have suggested, might ease the way toward an increased home patient population for some efficient facilities, the regulations are not arbitrary and capricious for omitting these particular features.

Plaintiffs stress that unless permanent injunctive relief from the composite rate system is granted, efficient facilities with fewer than the national average of home dialysis patients will be forced to reduce services and staff in a manner that will adversely affect patient care. Although they maintain that they accept defendants' decision to adopt a composite rate system, plaintiffs' argument does appear to be directed against the essential feature of the composite rate: a reimbursement rate set below the cost per treatment of in-facility dialysis and designed to promote home dialysis. Plaintiffs simply repeat their criticisms about barriers to increased home dialysis and the inability of facilities to profit under the composite rate to show inevitable irreparable injury. Affidavits from various doctors and facility directors, provided by plaintiffs, describe the nature of the health risks to patients and facilities under the composite rates. *E.g.*, Affidavit of Richard B. Freeman, M.D., Dec. 19, 1983. The Court strongly expresses its concern that inadequate reimbursement under the composite rates could impair health care quality. Yet, defendants indicate that HHS intends to monitor experience with the composite rates for any adverse impact on patient care and presumably will adjust the rates as that experience dictates.[14] Plaintiffs surely must appreciate that some threat of impairment to health care quality necessarily accompanies any cost-cutting initiatives in health care programs. The Court might have struck a different balance among all of these competing concerns, if it were writing on a clean slate. Yet, applying its considerable expertise in this complex area, to its review of a voluminous record, HHS has struck a reasonable balance that the Court should not disturb.

2. Inadequate Cost Information

■ Defendants based the composite rates on the national median costs for in-facility and home dialysis. Plaintiffs claim that in determining the cost figures, defendants relied on outdated information and excluded valid facility costs, such that the new composite rates do not reflect the real cost of dialysis services.

Plaintiffs maintain that defendants' cost data, from the period 1977–79, should have either been adjusted for inflation or updated. They point to the National Hospital Input Price Index prepared by HHS, which indicates that hospital costs increased markedly from 1977 to 1982, and to direct cost information, supplied by National Medicare, Inc., which indicates that labor costs per treatment at independent dialysis facilities increased 46 percent from 1978 to 1981.

In the final rule, defendants discussed this issue at length. They explained that the total cost per treatment, the only relevant cost in developing the composite rates, has not risen over time and that increased efficiencies in treatment may have offset potential increases. 48 Fed.Reg. at 21262.[15] Thus, defendants believe that the

---

**13.** Defendants point out that in an urban area an exception could be considered for an "isolated essential facility." 48 Fed.Reg. at 21256. Or, an exception could be considered for a facility serving an "atypical patient mix". *Id.* Declaration of Bernadette Schumaker, Oct. 13, 1983 at ¶ 6. *See also infra* at 1123–1124.

**14.** *See* Declaration of Margaret Van Amridge, Acting Director, Office of Survey and Certification, Health Standards and Quality Bureau, HCFA (no reports of patients with problems obtaining care as a result of the limited facility withdrawals since Nov. 21, 1981).

**15.** Plaintiffs themselves have remarked that:
"It is also important to emphasize that the per treatment costs of the ESRD program have remained *more or less constant for nearly ten* years. The overall increase in ESRD program expenditures during that time is attributable mainly to the life sustaining effectiveness of the program, permitting the survival of thousands of patients who previously would have died.... On a per treatment or per patient basis, however, ESRD program expenditures have *not* risen dramatically—particularly when compared to the cost of most other types of intensive medical treatment."

composite rates properly reflect the costs of dialysis services today. Also, defendants noted that many dialysis facilities have prospered and expanded at the prior rate and many new facilities have entered the market, since the new prospective rates were announced. *Id. See also* Declaration of Sandra Kappert, Acting Branch Chief, ESRD Systems Branch, Bureau of Data Management and Strategy, HCFA at ¶¶ 3–7. HHS declined to adjust the rates for inflation because such an adjustment would be contrary to Congress' cost-containment objective and would only guarantee further cost increases. *See* 48 Fed. Reg. at 21268. Defendants explained further that the rates may be adjusted based upon annual cost reports from dialysis facilities. 48 Fed.Reg. at 21259, 21268. This flexibility will enable them to conform the rates to actual costs. Audits are scheduled to be completed by July, 1984.

The statute directs the Secretary to proscribe methods and procedures "to determine the costs incurred by providers of services and renal dialysis facilities and ... on a cost related or other economical and equitable basis ... the amounts of payments to be made for Part B services ...." 42 U.S.C. § 1395rr(b)(2)(B). Plaintiffs have not specified any cost information that defendants have ignored; rather, they emphasize that defendants were aware of rising labor costs and merely surmise that other costs, such as rent and utilities, must have risen similarly. Based upon the record before the Court, the regulations reasonably implement the statute in this regard, and must be upheld.

Three categories of facility costs have been excluded in setting the composite rates: return on equity, "excessive" compensation for facility administrators and medical directors, and "other" costs. Plaintiffs contend that these costs amount to 15 percent of the total audited costs on which the composite rates were based, and

that each of the exclusions is arbitrary and capricious.

Even if return on equity, the cost of investment capital, may be described as a real business cost, return on equity is not an element of Medicare reasonable cost. Rather, defendants view it as an allowance above cost to encourage needed expansion. Defendants maintain that including this allowance in the composite rate base would weaken the incentives established through the rates. 48 Fed.Reg. at 21261. While the statute authorizes a reasonable rate of return on equity capital, it explicitly leaves it to the Secretary to determine whether such a provision is "feasible and appropriate." 42 U.S.C. § 1395rr(b)(2)(C). Given this statutory language, the Court must sustain the agency's determination that return on equity is an inappropriate cost item for Medicare reimbursement.

"Excessive" compensation for facility administrators and medical directors is defined as all compensation above $32,000 per year. Plaintiffs maintain that negotiated compensation agreements between privately-owned facilities and management personnel represent business judgments regarding the cost-effectiveness of purchasing managerial skills. Defendants responded to this argument in the preamble to the final rule. Only 5 percent of the audited facilities paid unallowable amounts for medical directors' salaries. Facilities remain free to pay whatever salaries they choose; however, Medicare cannot include salaries in excess of $32,000 per year in the rate base when the great majority of facilities pay less than that amount. 48 Fed. Reg. at 21262. The Court agrees with defendants that a limit that covers 95 percent of the audited salaries is reasonable.

Finally, plaintiffs challenge the exclusion of "other" costs, including facilities' cost of compliance with federal securities laws, and the cost of office space furnished to physicians functioning as managers and administrators. Plaintiffs argue that facili-

ties have no control over the cost of complying with federal law and the other costs are "presumptively reasonable." Certainly the propriety of excluding these "lesser items", as plaintiffs have called them, from the rate base, is not an appropriate matter for judicial oversight. Defendants explain that, by nature, a prospective rate system does not require facilities to justify particular expenditures. Facilities must make their own decisions regarding the allocation of Medicare expenditures.

3. Exclusion of Return on Equity in the Exceptions Process

 The statute directs the Secretary to provide for exceptions to the composite rate "as may be warranted by unusual circumstances (including the special circumstances of sole facilities located in isolated rural areas.)" 42 U.S.C. § 1395rr(b)(7). Congress envisioned that the exceptions process would accommodate facilities, usually hospitals, with sicker, more costly patients. *See* H.R.Rep. No. 158, V, 97th Cong., 1st Sess. 324 (1981). The reimbursement regulations permit an exception when a facility demonstrates reasonable costs that exceed the composite rate due to an "atypical patient mix" or other specified factors. 42 C.F.R. §§ 409.439(f)(2), (g); 48 Fed.Reg. at 21278–21279.

Plaintiffs argue that the exceptions process is a *de facto* cost-based reimbursement. Excluding return on equity from the exceptions process is arbitrary and capricious because for-profit facilities needing an exception will be denied the opportunity to earn any return on the capital expenditures they have made, and thus, will eventually have to close. Some support for

plaintiffs' position is found in a Medicare regulation applicable to proprietary acute-care hospitals, which states that "proprietary institutions historically have financed capital expenditures through funds invested by owners in the expectation of earning a return. A return on investment, therefore, is needed to avoid withdrawal of capital and to attract additional capital needed for expansion." 42 C.F.R. § 405.529(b)(1).

However, here, HHS has taken the approach that proprietary facilities must compete with nonproprietary facilities and must earn their profit through increased efficiencies. Return on equity is not considered a cost under Medicare reasonable cost principles. 48 Fed.Reg. at 21257. Defendants point to a discussion of the legislative intent in providing a return on equity to proprietary hospitals in *American Medical International, Inc. v. Secretary of HEW,* 466 F.Supp. 605, 613–14 (D.D.C. 1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981). The purpose of that return on equity allowance "was to encourage the expansion of post-hospital care facilities because of a perceived shortage of nursing home beds. 112 Cong.Rec. 27072 (October 20, 1966). ... [T]he return on equity provision is an exception to the usual requirement that reimbursable costs be closely linked to providing medical care." *Id.* at 614 (footnote omitted). The expansion purpose is absent in this case.[16]

4. Changes in the Reimbursement for Physicians' Services

a. Abolition of the "Initial" Method of Reimbursement

 Under the former system of reimbursement of physicians' services, as de-

**16.** Plaintiffs allege two additional defects in the exceptions process: that the bad debt reimbursement provision only reimburses facilities up to their reasonable costs, which excludes a return on equity; and, that an exception is granted retroactively only to the time HHS received from the Medicare intermediary a completed application for the exception. Since defendants exclude return on equity from the exceptions process altogether, the limitation on bad debt reimbursement appears reasonable for similar reasons. Under the former regulations HHS did not separately reimburse the Medicare

bad debts of any independent facilities. Plaintiffs' challenge to the granting of exceptions prospectively only rather than retroactively to the beginning of the period for which the need for an exception has been demonstrated, misconstrues the nature of the exceptions process. Under the prospective composite rate system a facility may *project,* based upon experience, that it will have costs in excess of its prospective rate attributable to one of the specified factors, and may request an exception to its rate. If an exception is granted the facility is paid a higher *prospective* rate.

scribed above, physicians either negotiated their compensation with the dialysis facility and Medicare then reimbursed the facility (the Initial Method), or Medicare directly reimbursed the physician with a single monthly payment. Plaintiffs maintain that the new regulations, which establish a single monthly capitation payment system, are contrary to the intent of Congress to provide two methods of physician reimbursement, and therefore are "not in accordance with law." 5 U.S.C. § 706(2)(A).

The statute provides that:

> With respect to payments for physicians' services furnished to individuals determined to have end-stage renal disease, the Secretary shall pay 80 percent of the amounts calculated for such services—
>
> (A) *on a reasonable charge basis* [but may, in such case, make payment on the basis of the prevailing charges of other physicians for comparable services] except that payment may not be made under this subparagraph for routine services furnished during a maintenance dialysis episode, *or*
>
> (B) on a comprehensive monthly fee or other basis (*which effectively encourages the efficient delivery of dialysis services and provides incentives for the increased use of home dialysis*) for an aggregate of services provided over a period of time (as defined in regulations).

42 U.S.C. § 1395rr(b)(3) (emphasis added in subparagraph (A); 1981 amendment emphasized in subparagraph (B)). Defendants assert that this provision, drafted in the disjunctive, authorizes HHS to reimburse physicians under one or both methods. *See* 48 Fed.Reg. at 21258.

However, in the 1978 Amendments to the ESRD program, Congress recognized that then existing law provided for alternative reimbursement methods:

> [U]nder present program policies, physicians have a choice between two methods for receiving reimbursement for routine maintenance dialysis services ... Use of these optional reimbursement methods is consistent with the Congressional intent to develop reimbursement methods and

procedures designed to address the unique circumstances involved in the provision of maintenance dialysis services. S.Rep. No. 714, 95th Cong., 2d Sess. 10 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 848, 857–58; H.R.Rep. No. 549, 95th Cong., 1st Sess. 11–12 (1977). Congress also recognized the "Secretary's authority under present law" to provide reimbursement "in accordance with alternative reimbursement methods." *Id.*

Defendants maintain that the legislative history indicates that Congress intended to preserve, rather than restrict, HHS' discretion. Accordingly, contrary to plaintiffs' reading, it does not require them to retain both reimbursement methods. Moreover, the 1981 program amendments direct HHS to promote home dialysis. Defendants maintain that the "Initial Method" of physician reimbursement acts as a disincentive to home dialysis:

> The 1981 Omnibus Budget Reconciliation Act retained the explicit statutory authority ... to reimburse physician services under alternative methods. It also required the Secretary to encourage the efficient delivery of dialysis services and home dialysis through physician reimbursement just as is required through facility reimbursement. Since, under the initial method, physicians do not see home patients often there is less economic incentive for them to refer their patients for home dialysis. The initial method is therefore not well suited for promoting home dialysis and we are accordingly proposing to discontinue this option in order to fulfill the objectives of the 1981 amendments.

47 Fed.Reg. 6556, 6566 (Feb. 12, 1982).

Elimination of the Initial Method is a drastic and illegal response to this problem. Congress has explicitly endorsed the use of alternative reimbursement methods. Furthermore, as plaintiffs indicate, the operative phrase in the statute is the "Secretary shall pay." 42 U.S.C. § 1395rr(b)(3). In contrast, section 1395rr(b)(4) provides that the "Secretary may make payments" for supplies and equipment in one of two ways.

This distinction supports the conclusion that Congress has mandated both methods. HHS must adapt the Initial Method to advance the Congressional purpose of encouraging home dialysis,[17] any administrative inconvenience notwithstanding.[18]

b. Revisions to the Monthly Capitation Payment System

■ The new regulations substitute a "base multiplier" of 12.4 for the pre-existing "conversion factors" of 20 for services to in-facility patients and 14 for services to home dialysis patients, in determining physician reimbursement under the monthly capitation payment system.[19] Plaintiffs argue that defendants' explanation for this departure—that 12.4 corresponds to the potential number of dialysis treatments per month plus a monthly examination—is wholly irrational. They maintain that there is no relationship between the number of times a patient dialyzes each month and the extent or frequency of physicians' services furnished in that period of time. Rather, in-facility patients are often seen by a physician during dialysis and also at other times. Home patients are rarely seen when they dialyze, but may be seen frequently at other times. In addition, renal physicians associated with dialysis facilities provide a wide variety of services that do not involve direct contact with individual patients. Therefore, plaintiffs maintain, use of the 12.4 base multiplier does not properly reflect the value of renal physicians' services.

Defendants' position is that use of the 12.4 multiplier is a reasonable way of estimating overall physician involvement for the average dialysis patient, and that credible evidence in the record indicates that physicians have been compensated excessively in relation to the services they perform. *See The End Stage Renal Disease Program (Part I—Management of the Program)*, Hearings before a Subcommittee of the Committee on Government Operations, House of Representatives, 97th Cong., 2d Sess. at 239–251 (Feb. 23 and 24, 1982). Indeed, defendants believe that plaintiffs challenge the revised method because it will result in lower reimbursement for some physicians. Defendants explain that

> [w]hen compared to previous payment levels, it is clear that this payment level will result in a significant reduction in the amounts paid for physician services related to in-facility treatment. However, it will also result in an even larger *increase* in the amounts paid for services to home patients. As a result, the effect on an individual physician would be dependent on the proportion of patients dialyzing at home. Physicians with no home patients could experience a significant reduction in gross revenues related to dialysis services, while others, with larger home practices, could be significantly benefited.

48 Fed.Reg. at 21289 (emphasis in original). The revised method, thus promotes home dialysis and results in budgetary savings.

To the extent that plaintiffs claim the choice of 12.4 as the multiplier is arbitrary, defendants maintain that the former conversion factors, which were similarly reached after study and consultation, no more precisely reflected the frequency and intensity of physicians' services to maintenance dialysis patients. Defendants have considered that not every patient will be seen by a physician during each dialysis session. The 12.4 figure, which includes the payment for a monthly examination,

---

**17.** Plaintiffs suggest that to preserve the Initial Method and at the same time remove any disincentives to home dialysis, defendants could (1) confine the Initial Method to physicians' services rendered to in-facility patients, or (2) extend the Initial Method to cover both in-facility and home dialysis in the same manner.

**18.** The Court's determination that defendants' abolition of the Initial Method is not in accordance with law, renders it unnecessary to reach plaintiffs' second argument: that defendants have overlooked patients in Illinois who are dependent on Medicare benefits for coinsurance amounts. The Illinois Medicare program only makes payment to facilities for physicians' services furnished during dialysis treatment.

**19.** In its original form this method was called the "Alternative Reimbursement Method."

reflects this awareness, as well as defendants' awareness that physicians perform services at times other than during dialysis, and the value of those services. 48 Fed. Reg. at 21269. As such, plaintiffs' references to defendants' statements in the record indicating the difficulty involved in measuring the nature and extent of physicians' services [20] do not support their notion that defendants should have retained the previously developed conversion factors.

5. Defendants' Failure to Provide for a Phase-in Period

■ Plaintiffs allege that in failing to phase in the new reimbursement regulations, defendants have disregarded the limited capacity of dialysis facilities to reduce fixed costs and to immediately increase significantly their home populations. They also allege that defendants have acted contrary to Congressional intent. The possibility of a transition period, during which the new reimbursement rates would be introduced in stages, was considered in committee hearings. *See Proposed Regulations Governing Reimbursement Under the Medicare End-Stage Renal Disease Program,* Hearings Before the Subcommittee on Oversight of the Committee on Ways and Means, House of Representatives, 97th Cong., 2d Sess. at 206–208 (Apr. 22, 1982). However, no transition period was enacted into the law.

Pointing to provisions for transition periods in related legislation modifying Medicare reimbursement in other areas, plaintiffs maintain that Congress has expressed a preference for a transition period in this context. *E.g.,* Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97–248, § 101(a), 42 U.S.C. § 1395ww. Yet, plaintiffs have merely demonstrated that Congress knows how to provide for a transition period when one is deemed desirable and elected not to do so here.

The reimbursement regulations, effective August 1, 1983, were designed to implement a statute which became effective October 1, 1981. The industry had been on notice of changes in the reimbursement rates since July, 1979. Defendants did allow approximately 75 days after publication of the regulations for adjustment to the new rates and provided that the wage index for the first two years would be limited to protect particularly rural facilities from experiencing immediate adverse effects. 48 Fed.Reg. at 21268, 21276. HHS has not acted arbitrarily and capriciously in deciding not to phase in these regulations.

C. *Secondary Payment Regulations*

Section 2146 of the Omnibus Budget Reconciliation Act of 1981, which amended Section 1862(b) of the Social Security Act (codified at 42 U.S.C. § 1395y(b)(2)(A)), provides that payment of conditional primary Medicare benefits on behalf of ESRD patients for the initial 12 months of eligibility, may not be made to the extent that payment under an employer group health plan has been made, or the Secretary has determined that payment under such a plan will be made as promptly as Medicare payments.[21] On April 5, 1983, defendants promulgated final regulations to implement the statute. The secondary payment regulations provide that conditional primary Medicare benefits will not be paid unless the Medicare intermediary or carrier knows from experience or ascertains that the em-

---

**20.** *The End-Stage Renal Disease Program (Part I—Management of the Program),* Hearings Before a Subcommittee of the Committee on Government Operations, House of Representatives, 97th Cong., 2d Sess. at 252 (Feb. 23, 1982).

**21.** 42 U.S.C. § 1395y(b)(2)(A) (Supp. V 1981) provides:
"In the case of an individual who is entitled to benefits under part A or is eligible to enroll under part B of this subchapter solely by reason of section 426–1 of this title, *payment under this*

*subchapter may not be made,* except as provided in subparagraph (B), with respect to any item or service furnished during the period described in subparagraph (C) *to the extent that* payment with respect to expenses for such item or service (i) has been made under any group health plan (as defined in section 162(i)(2) of Title 26) or (ii) the Secretary determines will be made under such a plan as promptly as would otherwise be the case if payment were made by the Secretary under this subchapter." (Emphasis added.)

ployer group health plan payments will be substantially less prompt than Medicare payments. The secondary payment regulations do not provide specifically for a determination by the Secretary that employer group health plan payments will be "as prompt as" Medicare payments.

Plaintiffs argue that the plain language of the statute and the legislative history clearly indicate that Congress intended that conditional primary payments must be made except where defendants have made a determination that payment under an employer group health plan will be as prompt as Medicare. That determination is to be made prior to terminating conditional primary payments and paying only secondary amounts. Thus, plaintiffs maintain, the secondary payment regulations, which invert the statutory mandate, contravene the intent of Congress. Defendants assert that the statute vests the Secretary with discretion as to the coordination of Medicare payments and employer plan payments. They argue that the Secretary has exercised her discretion in a reasonable manner in determining that payment would be made under employer group health plans as promptly as it would be under Medicare, unless the Medicare intermediary or carrier knows from experience or ascertains that those payments will be substantially less prompt than Medicare payments.[22]

In essence, the Secretary has delegated the task of determining the promptness of payment by employer plans in individual cases to the intermediary or carrier, and has relaxed the standard of comparative promptness from the statutory, "as promptly as" Medicare, to "substantially less prompt than" Medicare.

■ The agency's expertise in the complex area of health care regulation entitles it to a large measure of deference from the Court.[23] However, deference is not warranted in this instance because, in promulgating these regulations, the Secretary has disregarded the statutory language and has undermined the statutory objective. If the agency rejects the reasonable interpretation of the statute, the Court must "honor the clear meaning of a statute, as revealed by its language, purpose and history." *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979).

■ The statute explicitly directs the Secretary not to pay ESRD benefits to the extent that she determines that employer plan payments will be as prompt as Medicare payments. Defendants claim that the Secretary has already made that determination overall. However, the Secretary has provided no explanation for this conclusion, other than the bald statement that it is "reasonable" to expect employer plans to pay promptly. 48 Fed.Reg. at 14807.[24] Defendants' failure to articulate reasons is alone sufficient to render the regulations arbitrary and capricious. *See e.g., Motor Vehicle Manufacturers Ass'n*, 463 U.S. at ——, 103 S.Ct. at 2866–67 (1983).

Moreover, the legislative history envisions that defendants make such a determi-

---

**22.** As a preliminary matter, defendants assert that plaintiffs' claim is not ripe for a disposition by the Court because they merely speculate as to adverse effects of the challenged regulation unintended by Congress and they have failed to show any concrete inquiry from defendants' implementation of the statute. Defendants believe that postponement of judicial review of this claim will impose no hardship on plaintiffs and afford the Court an opportunity to evaluate the regulations as they are applied.

Plaintiffs have raised the purely legal question of whether the Secretary has properly construed the intent of the statute. In addition, they have alleged imminent and concrete hardship in the prospect of delayed reimbursement of primary amounts under these regulations. Under the test for ripeness articulated in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), plaintiffs' challenge to the secondary payment regulations is ripe for review.

**23.** *See, e.g., Psychiatric Institute of Washington, D.C., Inc. v. Schweiker*, 669 F.2d at 813; *American Friends Service Comm. v. Webster*, 720 F.2d 29, 60 (D.C.Cir.1983).

**24.** Curiously, defendants also assert that it will "be difficult and costly to recoup from various employer plans." 48 Fed.Reg. at 14807.

nation prior to terminating conditional primary payments and paying only secondary amounts:

> Medicare would pay for the beneficiary's care in the usual manner and then obtain reimbursement from the beneficiary's private group health insurance plan for the items and services covered by that plan until such time as the Secretary determines that the beneficiary's plan has begun to make payments promptly or will be able to make such payments as promptly as would be the case if Medicare were making the payment.

H.R.Rep. No. 208, 97th Cong., 1st Sess. 955, 956 (1981), (Conference Report), *reprinted in,* [1981] U.S.Code Cong. & Ad. News 396, 1318. Defendants seemingly ignore this straightforward expression of congressional intent and rely instead on a Senate bill which was not enacted. Nothing in the report on the Senate bill, however, buttresses defendants' position as to the timing of the Secretary's determination regarding plan payment promptness. S.Rep. No. 139, 97th Cong., 1st Sess. 469–470 (1981), *reprinted in* [1981] U.S.Code Cong. & Ad.News 735–736. The secondary payment regulations, which provide for secondary payments and require a determination by the intermediary or carrier prior to conditional primary payments, are flatly inconsistent with the statute. While the statute vests the Secretary with discretion to determine "the point at which medicare need no longer be the first payor," H.R. Rep. No. 208 at 956, U.S.Code Cong. & Admin.News 1981, p. 1318, that discretion is circumscribed by the statutory definition of that point: when employer plans pay "as promptly as" Medicare.

Defendants again emphasize language in the Senate provision, which permitted the Secretary to withhold ESRD benefits for the initial 12 months of a patient's eligibility to the extent that payment was "reasonably expected to be made (as determined by regulation), by any private health plan or policy of insurance." S.Rep. No. 139 at 469, U.S.Code Cong. & Admin.News 1981, 735. The House Conference Committee version of the bill, which was passed, modified the Senate version by making Medicare benefits secondary only to employer group health plans, and substituting the language "as promptly as" for the Senate's language "can reasonably be expected." Defendants' reliance on the Senate provision, therefore, does not advance their cause. The substituted language was a response to the conferees' concern about patient anxiety regarding the source of promptness of payment and delays in reimbursement. The Conference Report states:

> It is the conferees' intent, in providing for such administrative discretion with respect to the point at which medicare need no longer be the first payor, that the Secretary's decision will be made in recognition of the need to assure prompt payment, avoid inconvenience to the patient and, encourage home dialysis. The payment arrangements contemplated by the conferees are intended to minimize patient anxiety about the source of promptness of payment and to avoid delays in reimbursement for expenses incurred in connection with the use of renal equipment, supplies or services.

H.R.Rep. No. 208 at 956, U.S.Code Cong. & Admin.News 1981, p. 1318. In providing that an intermediary or carrier determine that employer plan payments are "substantially less prompt than Medicare's" before paying conditional primary amounts, the secondary payment regulations would appear to exacerbate, rather than alleviate, patient anxiety about payment promptness. Defendants explain that the regulations employ the standard "substantially less prompt" because the statutory standard, "as prompt as", offers no guidance to the intermediary or carrier as to when to pay. "Substantially less prompt", however, offers no more guidance, if not less. Such a departure from the balance struck by Congress between effective health care delivery and savings to the Medicare program is arbitrary, capricious and not in accordance with law. The Secretary's discretion does not entitle her to rewrite the statute. *See Tennessee Valley Authority v. Hill,* 437

U.S. 153, 194, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978).